Robert E. WRIGHT; Barbara J. Wright, Plaintiffs–Appellants,

v.

NATIONAL WARRANTY COMPANY, L.P.; National Warranty, Inc.; Bumper to Bumper Program, Inc.; AI Automotive Corporation; Rose, Jackson, Brouillette & Shapiro; W. Thomas Boothe; Lee Synnott; Leonard Rose, Defendants–Appellees.

No. 90–6467.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 2, 1991.

Decided Jan. 9, 1992.

Gerald A. Smith, Jr., Blackburn, Little, Smith & Slobey, Nashville, Tenn. (argued and briefed), for plaintiffs-appellants Robert E. and Barbara J. Wright.

Frank S. King, Jr. (argued), John H. Yardley (briefed), King & Ballow, Nashville, Tenn., for defendants-appellees Nat. Warranty Co., L.P., Nat. Warranty, Inc., Bumper to Bumper Program, Inc., AI Auto. Corp., Rose, Jackson, Brouillette & Shapiro, W. Thomas Boothe, Lee Synnott and Leonard Rose.

Before NELSON and SUHRHEINRICH, Circuit Judges, and HOLSCHUH, Chief District Judge *.

SUHRHEINRICH, Circuit Judge.

Plaintiffs Robert and Barbara Wright appeal from the district court's grant of summary judgment in favor of defendants in this federal securities action. For the reasons that follow, we affirm in part, reverse in part and remand.

---

* The Honorable John D. Holschuh, Chief District Judge for the Southern District of Ohio, sitting by designation.

## I.

This case involves the transaction by which plaintiffs were sold equity interests in defendant National Warranty Company, L.P., ("NWP") and National Warranty, Inc. ("NWC"). NWC was formed for the purpose of implementing a program which would offer to small independent or regional companies lifetime warranties on automobile repair parts and labor competitive with warranties offered by national corporations. NWC planned to sell the warranty certificates to warehouse distributors who owned $100,000 in equity interests. The warehouse distributors would sell warranty coverage to consumers, who then would be able to redeem their lifetime warranties from any NWC dealer, who would in turn seek reimbursement from NWC.

It was determined that the proposed program would need $6,000,000 in funding. Of this amount, $2,000,000 was to be raised through the sale of stock in the new corporations, to be priced in $100,000 units. The remaining $4,000,000 was to be raised by the sale of lifetime warranty certificates to warehouse distribution facilities, such purchases being made prior to the facilities actively offering the certificates for sale.

The terms and conditions of the offering were set forth in the Private Placement Memorandum ("PPM") (a prospectus), dated November 21, 1988. Contained within the PPM were various proforma financial statements, including a "Proforma Income Statement," "Proforma Cash Flow," "Certificate Sales," "Dealer Enrollment Assumptions," and "Dealers Sold." Under the category marked "RISK FACTORS," PPM stated in part:

The market for or demand for the Partnership's product is unknown. The Financial Exhibits have been prepared based upon certain assumptions concerning sales, as set forth therein. However, the level of sales assumed in the Financial Exhibits may not be obtained or obtainable, which would adversely affect the economic performance of the Partnership.

NWC decided to hire a financial officer to handle its affairs. On December 20, 1988, plaintiff Robert Wright was interviewed for a job as Vice–President of Finance ("VPF") and Chief Financial Officer ("CFO") of NWC. At the interview plaintiff received a copy of the PPM. He was hired on December 28, 1988, and began work on January 3, 1989. As VPF and CFO, Wright was personally responsible for preparing the monthly profit and loss statements, cash flow statements, and balance sheets. Plaintiff also approved and signed all stock certificates, invoices, and wrote and signed all checks. He was also responsible for the collection efforts of NWC. In his capacity as Secretary and Treasurer, plaintiff attended all meetings of the Board of Directors of NWC. He also revised the income statement set forth in the PPM several times.

On March 29, 1989, approximately three months after he began employment, plaintiff and his wife purchased a $100,000 unit of NWC securities, which are the subject of this litigation.

By May 3, 1989, AI, NWC's largest proposed customer, informed NWC that it would not purchase more than the one $100,000 unit of NWC's repair warranty certificates it had already purchased. Even though AI had not contractually committed to do so, NWC had anticipated and relied in its projections on the fact that AI would purchase twelve additional $100,000 units of NWC's certificates. On May 17, 1989, a special meeting of NWC's board was held. Wright attended and briefed the directors on NWC's financial status. In his affidavit Wright stated that at this meeting he was informed for the first time that AI never committed to invest $100,000 per warehouse; and further that all of the Board understood that AI had no legal commitment to make such an investment.

Plaintiff attended another Board meeting on June 20, 1989. At that meeting, he allegedly demanded that his investment be returned, stating that had he been aware of AI's lack of commitment to the warranty program and financial difficulties, he would never have purchased the securities. On July 4, 1989, plaintiff was terminated due to the financial difficulties of NWC. At

that time, he formally tendered his securities and demanded a refund of his investment.

Plaintiffs brought suit on March 27, 1990, alleging *inter alia,* violation of the federal securities laws, including: (1) section 12(1) of the Securities Act of 1933 ("the Act"), 15 U.S.C. § 77*l* (1), based on defendants' offering and selling securities which were not registered with the Securities and Exchange Commission ("SEC") and which did not meet the requirements necessary to exempt them from registration; (2) section 12(2) of the Act, 15 U.S.C. § 77*l* (2), based on allegedly untrue statements or omissions of material fact in written and oral communications made by defendants to plaintiffs; (3) section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder; and violation of section 17(a) of the Act, 15 U.S.C. § 77q(a).

The district court granted defendant's motion for summary judgment on the grounds that Robert E. Wright's status as an "insider" and his access to information precluded any recovery under the Act and the Exchange Act; and that defendants qualified for an exemption from registration pursuant to section 4(2) of the Act, 15 U.S.C. § 77d(2). This appeal followed.

## II.

### A.

Plaintiffs argue that the district court erred in concluding as a matter of law that the securities offered and sold by defendants qualified for an exemption from registration with the SEC. The district court found that defendants met their burden of proving that they qualified for an exemption from registration pursuant to section 4(2) of the Act, 15 U.S.C. § 77d(2), and 17 C.F.R. § 230.501–508, Regulation D, by making the requisite filings with the appropriate federal and state authorities.

Section 12(1) of the Act provides in part that "any person who ... offers or sells a security in violation of Section 77e of this title shall be liable to the person purchasing such security from him," and autho-

rizes appropriate remedies for such violation. 15 U.S.C. § 77*l* (1). Section 5 of the Act, 15 U.S.C. § 77e, in turn makes it unlawful for any person, directly or indirectly, to make use of any means of communication in interstate commerce or the mails to sell such security through the use or medium of any prospectus unless a registration statement for such security has been filed with the SEC.

▪ The Act also creates exemptions to the registration requirements. Section 4(2) of the Act provides that the provisions of section 77e shall not apply to "transactions by an issuer not involving any public offering", 15 U.S.C. § 77d(2); and "transactions involving offers or sales by an issuer solely to one or more accredited investors, if the aggregate offering price of an issue of securities ... does not exceed [$5,000,-000]." *Id.* § 77d(6). Furthermore, pursuant to section 3(b) of the Act, 15 U.S.C. § 77c(b), the SEC has promulgated Regulation D, 17 C.F.R. 230.501–508, which establishes various "safe harbor" rules for offerings that satisfy conditions sufficient to invoke the section 4(e) exemption. Rule 505 of Regulation D provides as follows:

§ 230.505  Exemption for limited offers and sales of securities not exceeding $5,000,000.

(a) *Exemption.* Offers and sales of securities that satisfy the conditions in paragraph (b) of this section by an issuer that is not an investment company shall be exempt from the provisions of section 5 of the Act under section 3(b) of the Act.

(b) *Conditions to be met*–(1) General conditions. To qualify for exemption under this section, offers and sales must satisfy the terms and conditions of §§ 230.501 and 230.502.

(2) *Specific conditions*–(i) Limitation on aggregate offering price. The aggregate offering price for an offering of securities under this § 230.505, as defined in § 203.501(c), shall not exceed $5,000,000, less the aggregate offering price for all securities sold within the twelve months before the start of and during the offering of securities under this section in reliance on any exemption

under section 3(b) of the Act or in violation of section 5(a) of the Act.

(ii) *Limitation on number of purchasers.* There are no more than or the issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer in any offering under this section.

Rule 501 of Regulation D sets forth definition and terms used in Regulation D. Rule 501(a) defines the term "accredited investor" as follows:

(a) Accredited investor. Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

. . . . .

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

. . . . .

(8) Any entity in which all of the equity owners are accredited investors.

Regarding the disclosure requirements of an offering intended to be exempt under Regulation D, Rule 502(b)(1) provides as follows: "If the issuer sells securities under § 230.505 or § 230.506 to any purchaser that is not an accredited investor, the issuer shall furnish the information specified in paragraph (b)(2) of this section to such purchaser a reasonable time prior to sale." In other words, if the sale of securities is made exclusively to accredited investors, there are no registration requirements.

Defendants claimed exemption under Regulation D, and argued that they had complied with the requirements of 17 C.F.R. § 230.502–503. In support of that assertion, defendants offered the affidavit of Tad F. Trombley, an attorney with defendant Rose, Jackson, Brouillette & Shapiro. Trombley testified that he had complied with the requirements of 17 C.F.R. 230.503(a) and (b). On appeal plaintiffs contend that the sections relied upon by defendants do not provide exemptions from registration but merely contain definitions and conditions to be met. Thus plaintiffs contend that because defendants neither identified the rule under which they claimed an exemption nor offered evidence of their compliance with the conditions set forth in Regulation D summary judgment was improper.

This argument is without merit. First, Trombley's affidavit stated that the technical requirements found in 230.501–503 were satisfied. The affidavit also states that the Form D was duly filed with the SEC in accordance with 17 C.F.R. 230.-503(d). Further, it is undisputed that the amount of the offering was $1,900,000, clearly within the limits set forth in Rule 505. Finally, plaintiffs attested to the fact that they fit within one of the definitions of an accredited investor set forth in Rule 501(a). The district court did not err in finding no genuine issue of material fact.

Plaintiffs also argue that the exemption is not available since Mrs. Wright is not an accredited investor. We likewise reject this argument since Wright and his wife specifically warranted and represented in the subscription agreement, which closely parallels the language in Rule 501(a)(4)–(6) and (8) of Regulation D, that they were accredited investors. In addition, Wright represented himself to defendants as a sophisticated businessman and was also a fiduciary to the shareholders of NWC and NWP at the time he executed the subscription agreement. Finally, any failure to comply with the rules regarding Mrs.

Wright was harmless error within the meaning of 17 C.F.R. 230.508(a).

### B.

Plaintiffs also contend that the district court erred in concluding as a matter of law that Robert E. Wright's status as an "insider" precluded any recovery under the Exchange Act and the Act. We examine this issue under each Act in turn.

### 1.

■ Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, prohibit an issuer from making public statements that are untrue or materially misleading because of material omissions. *Levinson v. Basic Inc.*, 786 F.2d 741, 745–46 (6th Cir.1986), *vacated and remanded on other grounds*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). One of the elements of a section 10(b)/Rule 10b–5 claim, and the only element which concerns us here, is that of justifiable reliance on the defendant's material misrepresentations or omissions.[1] A recklessness standard is to be used in determining whether the plaintiff justifiably relied on a misrepresentation or omission. *Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir.1991) (citing *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983)).

■ Defendants urge us to rule that Wright's status as an "insider" forecloses recovery; or in other words, that his position within the company negates any finding of "justifiable reliance" on his part on the alleged misrepresentations and omissions of material fact. We decline to adopt such an absolute rule. As the Ninth Circuit has stated:

> The label "insider" ... is not determinative of the rights and liabilities of those persons who are suing and being sued for 10b–5 violations. The term "insider" is simply a shorthand description of those people who, by reason of their activities within a corporation, have access to information capable of being exploited, or information that would negate the harmful effects of a nondisclosure or misrepresentation. A director, officer, or even the president of a corporation often has that superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions.

*Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1338–39 (9th Cir.1977) (citations omitted). Rather, a plaintiff's insider status is one factor to be considered in evaluating whether a plaintiff's reliance was justified.[2]

■ While it is undisputed that Wright was a sophisticated investor and had access to pertinent information regarding NWC's financial condition and business plans, the record does not establish that Wright was a "insider" with respect to National Warranty's customers—or more specifically whether Wright had access to information on the financial condition and business plans of the biggest customer, AI Automotive. Plaintiff Robert Wright swore in his affidavit, which is corroborated by his dep-

---

**1.** In order to prevail on a section 10(b)/Rule 10b–5 claim, a plaintiff must establish (1) scienter on the part of the defendant; (2) materiality of the alleged misrepresentations or omissions by defendant; (3) actual reliance by plaintiff upon the defendant's misstatements or omissions, and (4) justifiable reliance. *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 753 n. 16 (11th Cir.1984); *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *accord, Levinson*, 786 F.2d 741. *See also Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1026 (6th Cir. 1979).

**2.** In a "non-insider" context, this court has considered the following noninclusive list of factors when determining whether a plaintiff's reliance on an alleged misrepresentation or omission is reckless:

> (1) The sophistication of expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Molecular Technology*, 925 F.2d at 918 (citations omitted).

osition testimony, that he "did not have access to any information or documents which demonstrated, or might demonstrate, the financial condition or business plans of AI Automotive;" and defendants have not shown that there was no genuine issue as to the fact of such access. Thus it cannot be said as a matter of law that plaintiffs' reliance was unreasonable. The district court therefore erred in granting summary judgment on the section 10(b)/Rule 10b–5 claim.

### 2.

■ Plaintiffs also argue that the district court erred in concluding as a matter of law that Wright's status as an "insider" precluded any recovery under section 12(2) of the Act, 15 U.S.C. § 77*l*(2). Section 12(2) provides that any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact" may be liable to an unknowing purchaser. 15 U.S.C. § 77*l*(2). Unlike a section 10(b)/ Rule 10b–5 claim, however, reliance on alleged misrepresentations or omissions is not an element of a section 12(2) cause of action.[3] As explained by the Tenth Circuit:

> The standards for bringing a claim under section 10(b) and Rule 10b–5 differ from those governing section 12(2). Under Rule 10b–5, unlike section[ ] 12(2) ... a purchaser must show justifiable or reasonable reliance on the defendant's misrepresentations in order to prevail.
>
> . . . .
>
> Section 12(2), on the other hand, has no requirement of justifiable reliance on the part of a purchaser. Because of this, a purchaser's investment sophistication is immaterial to a section 12(2) claim. A purchaser has no duty to investigate a seller's possible fraud and need not verify a statement's accuracy. Further,

cases setting forth the elements of a section 12(2) claim typically state simply that the plaintiffs must prove that they had no knowledge of any untruth or omission.

*MidAmerica Federal S & L v. Shearson/American Express, Inc.,* 886 F.2d 1249, 1256 (10th Cir.1989) (internal quotations and citations omitted). *See also Davis v. Avco Financial Services Inc.,* 739 F.2d 1057, 1068 (6th Cir.) (it is clear that scienter and reliance are not prerequisites for recovery under section 12(2)), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985); *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 689 (3rd Cir.1991) (same); *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 965 (9th Cir. 1990) (same); *Sanders v. John Nuveen & Co., Inc.,* 619 F.2d 1222, 1229 (7th Cir.1980) (plaintiff under section 12(2) is not required to prove due diligence), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981). Thus, the statute bars recovery only when a plaintiff has actual knowledge that a representation is false or knows that existing information has been withheld.

■ In the instant case, the district court based its decision entirely upon Wright's alleged access to the information and lack of due diligence in discovering it. But as noted above, Wright's sophistication as an investor is irrelevant to a section 12(2) claim, and he was under no duty to investigate for fraud.

Furthermore, plaintiffs presented sufficient proof to create a genuine issue of material fact as to their lack of actual knowledge. It is undisputed that the PPM in this case does not contain information regarding AI's financial difficulties or that AI never committed to invest $100,000 per warehouse. In addition, Wright stated in his affidavit that he had no knowledge as to these omissions and that the Board knew all along but did not inform him. Thus,

---

**3.** In order to establish a section 12(2) violation, a plaintiff must show that (1) defendants offered or sold a security, (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of a material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care could have known of the untruth or omission. *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–88 (3rd Cir.1991).

because the district court relied on a factor that is not an element of a section 12(2) claim and plaintiffs have raised sufficient proof to create a genuine issue of material fact as to their lack of actual knowledge, we conclude that summary judgment as to the section 12(2) count was inappropriate.

Accordingly, we hereby AFFIRM the district court's grant of summary judgment as to plaintiffs' section 12(1) claim; and RE-VERSE and REMAND as to the section 10(b)/Rule 10b–5 claim and section 12(2) claim for further proceedings consistent with this opinion.