EDWARD MARRAM, trustee,[1] vs. KOBRICK OFFSHORE FUND,
LTD., & others.[2]

Suffolk. February 3, 2004. - June 10, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

Practice, Civil, Motion to dismiss. Uniform Securities Act. Consumer Protec-
tion Act, Unfair or deceptive act.

Discussion of the background and purpose of the Uniform Securities Act,
  G. L. c. 110A, § 410. [50-55]
In a civil action against a mutual fund, its investment manager, and its
  corporate managing entity, alleging that the manager made materially
  misleading statements to the plaintiff before and after the plaintiff's invest-
  ment in the fund, and that the plaintiff sustained losses on its investment,
  the plaintiff sufficiently alleged a claim under the Uniform Securities Act
  (Act), G. L. c. 110A, § 410 (a) (2), to survive a motion to dismiss for
  failure to state a claim, where a claim under the Act could not be defeated
  by the mere existence of an integration clause in the defendants' subscrip-
  tion agreement, which the plaintiff acknowledged having received, read,
  and understood in full [55-56]; where G. L. c. 110A, § 410 (g), prohibited
  any person from waiving compliance with any provision of the Act [56-57];
  and where the alleged oral misrepresentations inherent to the transaction in
  question were material to the purchaser's investment decision [57-59].
This court declined to conclude as a matter of law that no factual scenario
  existed under which the plaintiff in a civil action against a mutual fund, its
  investment manager, and its corporate managing entity, alleging that the
  manager made materially misleading statements to the plaintiff before and
  after the plaintiff's investment in the fund, and that the plaintiff sustained
  losses on its investment, might establish a claim of negligent
  misrepresentation. [59-61]
In a civil action against a mutual fund, its investment manager, and its
  corporate managing entity, alleging that the manager made materially
  misleading statements to the plaintiff before and after the plaintiff's invest-
  ment in the fund, and that the plaintiff sustained losses on its investment,
  the plaintiff pleaded sufficient facts to state a claim under G. L. c. 93A,
  § 11. [61-63]

CIVIL ACTION commenced in the Superior Court Department on
June 21, 2001.

[1]For the Geo-Centers, Inc. Profit Sharing Plan and Trust.
[2]Kobrick Capital Management, LLC, and Frederick R. Kobrick.

A motion to dismiss was heard by *Allan van Gestel,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Philip Y. Brown (Edward F. Whitesell, Jr.,* with him) for the plaintiff.

*Patrick J. Sharkey* for the defendants.

MARSHALL, C.J. We review a judgment entered in the Superior Court dismissing an action commenced by an investor for violation of the Uniform Securities Act, G. L. c. 110A, § 410 (*a*) (2)[3]; negligent misrepresentation; and unfair and deceptive trade practices, G. L. c. 93A, § 11, against a mutual fund, its investment manager, and its corporate managing entity, on allegations that the manager made materially misleading statements to the plaintiff before and after the plaintiff's investment in the fund, and that the plaintiff sustained losses on its investment. Edward Marram, as trustee for Geo-Centers, Inc. Profit Sharing Plan and Trust (plan), maintained that Frederick R. Kobrick (Kobrick) made misleading statements concerning Kobrick Offshore Fund (offshore fund), which Kobrick controlled, in an effort to attract and retain the plan as an investor. The defendants countered that the express terms of the offshore fund's offering memorandum and subscription agreement, which Marram acknowledged having received, read, and understood in full, precluded Marram from bringing his claims. The defendants placed particular emphasis on the terms of an integration clause in the subscription agreement, which we discuss below. A judge in the Superior Court allowed the defendants' motion to dismiss all claims pursuant Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), which the defendants filed ten days after the action commenced. Marram appealed, and we transferred this case from the Appeals Court on our own motion. We conclude that, in the circumstances of this case, the

---

[3]General Laws c. 110A, § 410 (*a*) (2), states in pertinent part: "Any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him . . . ."

complaint in its entirety must survive the defendants' motion to dismiss. We vacate the judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.

1. *Standard of review.* The standard of review for a motion to dismiss pursuant to rule 12 (b) (6) is well settled. We take as true " 'the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor . . .' *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995). In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957)." *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). Although errors of law based on the facts alleged will not surmount a rule 12 (b) (6) challenge, the plaintiff's burden is "relatively light." *Id.*, citing *Gibbs Ford, Inc.* v. *United Truck Leasing Corp.*, 399 Mass. 8, 13 (1987). Under the "generous principles" governing our review in this matter, *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass. 140, 143 (1986), we summarize the facts alleged in the unverified complaint and in uncontested documents of record.[4]

2. *Alleged facts.* The plan is a profit-sharing plan for

---

[4]The defendants attached the offering memorandum and subscription agreement to their motion to dismiss, and the documents are included in the record. The documents were not attached to the complaint. Pursuant to Mass. R. Civ. P. 10 (c), 365 Mass. 752 (1974), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Where, as here, the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment, as required by Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). See, e.g., *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), cert denied sub nom. *Cortec Indus., Inc.* v. *Westinghouse Credit Corp.*, 503 U.S. 960 (1992) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon [the prospectus] in framing the complaint the necessity of translating a rule 12 [b] [6] motion into one under [Mass. R. Civ. P. 56, 365 Mass. 824 (1974),] is largely dissipated"); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 59-60 (D. Mass. 1994) (holding that court could consider prospectus, attached to defendant's motion to dismiss, without converting it to a motion summary judgment).

employees of Geo-Centers, Inc., a high technology and professional services firm headquartered in Massachusetts. The offshore fund is a hedge fund[5] that solicits business in Massachusetts. It is incorporated under the mutual fund laws of the Cayman Islands.[6]

The complaint alleges that, on December 17, 1999, Marram and Kobrick met to discuss the possibility of the plan investing in one of Kobrick's mutual funds. Marram told Kobrick that the plan was seeking to invest in a diversified fund that would preserve capital. Kobrick touted his "long history of success as a fund manager," represented that the offshore fund was "diversified" and "invested in a variety of industries," and "represented that the stock of high technology companies did not constitute a majority of the [offshore fund's] holdings and that he managed the [offshore fund] in such a way that it would not be a volatile investment vehicle." After the meeting, Kobrick forwarded to Marram a private offering memorandum and a subscription agreement for the offshore fund. The documents contain numerous representations and covenants. We summarize some of the pertinent terms here, reserving others for later discussion.[7]

The private offering memorandum describes the offshore fund's objectives as follows: "to achieve above-market growth in shareholders' capital, principally through investment in equity securities and equity related instruments while seeking to control risk." It further states:

"The Fund will hold a diversified portfolio of securities, use leverage in pursuit of additional return and hold

[5]A hedge fund is a "specialized investment group — [usually] organized as a limited partnership or offshore investment company — that offers the possibility of high returns through risky techniques such as selling short or buying derivatives." Black's Law Dictionary 727 (7th ed. 1999).

[6]Kobrick is a resident of Massachusetts, with a principal place of business herein.

[7]The subscription agreement provides that the agreement "shall be governed, construed and enforced in accordance with the laws of the Cayman Islands." In their memorandum in support of their motion to dismiss, the defendants assumed, but did not concede, that Massachusetts law applies, but only for purposes of the motion to dismiss. On appeal, they make no claim that the law of the Cayman Islands applies and we do not consider that issue.

short positions as a hedge and potential source of additional return. . . . The Fund expects to invest in companies of all sizes and a variety of industries. However, the Fund does not have fixed guidelines for diversification and may concentrate investments in specific industries or companies if the Investment Manager believes that such concentration will offer optimal opportunity for risk adjusted capital appreciation. . . . In general, the Fund's investment program has been broadly structured to provide the Investment Manager with maximum flexibility to achieve the Fund's investment objective."[8]

Elsewhere, the private offering memorandum describes the offshore fund as "speculative" and entailing "a high degree of risk."[9]

The subscription agreement directs the investor to "the risk factors referred to in the [m]emorandum." Two statements in the subscription agreement are particularly germane here. The first represents:

"The Investor has received and read a copy of the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Fund. The Investor acknowledges that in making a decision to subscribe for Shares the Investor has relied solely upon the Memorandum, the other Fund Documents and independent investigations made by the Investor. The Investor understands the investment objectives and policies of, and the investment strategies which may be pursued by, the Fund. The Investor's investment in the Shares is consistent with the investment purposes and objectives and cash flow requirements of the Investor and will not adversely affect the Investor's overall need for diversification and liquidity. The investor acknowledges that it has had the opportunity to ask questions of the Investment Manager, prior to the

---

[8]These statements are repeated in the same or nearly identical form throughout the private offering memorandum.

[9]Included in the list of risks identified by the private offering memorandum are, inter alia, conflicts of interest, investment in small and medium capitalization issuers, lack of diversification guidelines, short selling and the use of options, absence of regulatory oversight, and participation in highly volatile markets.

sale of the Shares and to obtain any additional information to the extent the Fund possesses such information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in the Memorandum."[10]

The second is an integration (or merger) clause, whereby the investor acknowledges: "This Subscription Agreement constitutes the entire arrangement and understanding between the parties hereto regarding its subject matter, and supersedes any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same."[11]

On January 1, 2000, shortly after Marram executed and submitted the subscription agreement, the plan purchased 1,500 shares of Series 2 stock for $1.5 million. On March 1, 2000, the plan invested an additional $500,000 in the offshore fund, purchasing 500 shares of Series 4 stock. On March 23, 2000, three months after the plan's initial investment, Marram received the offshore fund's audited financial statements for the year ending December 31, 1999. The report stated that the offshore fund was not diversified and was heavily invested in high technology stock.[12]

Beginning in March, 2000, the offshore fund's value declined precipitously. Thereafter, Kobrick made numerous, almost monthly, reassuring statements to Marram, by letter, by telephone, and by facsimile transmission, that the offshore fund's losses would be recouped and that the market situation

[10]The subscription agreement also contains a covenant that the investor "has obtained, in the Investor's judgment, sufficient information from the [offshore fund] or its authorized representatives to evaluate the merits and risks of such investment."

The private offering memorandum states that "[t]he Investment Manager will make available to each prospective investor . . . the opportunity to ask questions of, and receive answers from, the Investment Manager concerning the investment program of the [offshore fund]."

[11]The plaintiff has not claimed that the private offering memorandum or the subscription agreement contained misrepresentations.

[12]The complaint alleges that the report of the independent auditors also stated: "In presenting its condensed schedule of investments, the Fund declined to present the name of each investment constituting more than five percent of net assets. Disclosure of this information is required by accounting principles generally accepted in the United States of America."

worked well for Kobrick's investment style.[13] When the two men met on October 19, 2000, Kobrick urged Marram to maintain the plan's investment, telling him that no investors had left the offshore fund and that new money was coming into it. While declining to provide Marram with a list of securities in the offshore fund's portfolio, Kobrick told Marram that the offshore fund was diversified, that the "economy plays well into [his] philosophy," and that the economy was rebounding. Yet share value continued to fall. By November 30, 2000, the Series 2 stock had declined 60.67%, and the Series 4 stock had declined 67.60%.

On December 11, 2000, Marram directed the offshore fund, by letter, to liquidate the account. Kobrick asked Marram to reconsider. In a telephone conversation with Marram on December 27, 2000, he urged Marram to stay with the offshore fund. Kobrick stated that he was "very confident" that, in doing so, the plan would reap the "highest reward[s]." Kobrick also promised to provide Marram with a list of companies the offshore fund held, an analysis of the sectors that caused the offshore fund's losses, and an analysis of the sectors that would recover losses. Kobrick allegedly told Marram that the offshore fund had started to do better, and that it was not invested in any "dot.coms." After this conversation, Marram rescinded the December 11, 2000, liquidation order.

Marram never received the information Kobrick promised. On April 3, 2001, Marram again requested that the plan's invest-

---

[13]The complaint alleges, inter alia, that in June, 2000, Kobrick wrote to Marram stating that "[w]e feel strongly that this is a transition out of what has really been a long bear market for the average stock. We feel confident in our portfolio position going forward." In a letter dated July 7, 2000, Kobrick wrote to Marram: "We believe that these losses will be recovered and there will be a resumption of good gains." Kobrick's handwritten note on the letter stated: "This *shall* be a good year! *Normalcy* and our kind of markets are returning!" (Emphases in original.) Despite the plummeting value of the offshore fund, Kobrick sent similar written assurances to Marram in August, September, and October, 2000, and in December, 2000. In a letter of December 4, 2000, Kobrick stated to Marram, among other things, that the severe decline in the market and bad economic forecasts gave "rise to . . . *spectacular* opportunities," cautioned against losing faith in the offshore fund, and represented that "[i]n every instance of this type of sell-off over the past 30 years, we have managed through to achieve new portfolio highs. The more severe, the higher were the gains." (Emphases in original.)

ment be liquidated. While it is unclear from the complaint exactly when the shares were liquidated,[14] Marram alleges that, in total, the plan invested $2 million in the offshore fund and incurred a loss of $1,415,210 over the investment period.

3. *Uniform Securities Act, G. L. c. 110A, § 410.* Before addressing the merits of the defendants' motion to dismiss the securities claim, we discuss in some detail the background and purpose of G. L. c. 110A, § 410 (*a*) (2). The Uniform Securities Act, G. L. c. 110A (act), broadly regulates securities offerings in Massachusetts.[15] Like its counterpart, the Federal Securities Act of 1933, 15 U.S.C. §§ 77a et seq. (2000), the act creates criminal and civil liability for securities-related infractions. See, e.g., G. L. c. 110A, §§ 409, 410. See also 15 U.S.C. §§ 77k, 77l, 77y. However, G. L. c. 110A, § 410 (*a*) (2), "provides the only civil remedy under the Uniform Securities Act for misrepresentations and omissions." J.C. Long, Blue Sky Law § 9:23 (2003). It imposes "civil liability for sales [of securities] by means of fraud or misrepresentation." L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 410 (*a*), at 147 (1976).

The Legislature has directed that we interpret the act in coordination with the Securities Act of 1933. See St. 1972, c. 694 (enacting G. L. c. 110A, § 415, and directing court "to coordinate the interpretation and administration of this chapter with the related federal legislation"). See also *Adams* v. *Hyannis Harborview, Inc.*, 838 F. Supp. 676, 684 n.9 (D. Mass. 1993) (Massachusetts securities laws "are substantially similar to the Federal securities laws and therefore decisions construing the Federal statutory language are applicable to the state statute as well"). General Laws c. 110A, § 410 (*a*) (2), "is almost identical with § 12 (2) of the Securities Act of 1933, 15 U.S.C.

[14]The complaint alleges that, "[o]n April 3, 2001, the Plan requested that its holdings in the Offshore Fund be liquidated."

[15]"The Uniform Securities Act, enacted in 1972, sets forth those practices which are deemed unlawful, requires the registration of broker-dealers and agents and of securities; regulates the filing of sales and advertising literature; prohibits misleading filings and unlawful representations concerning registration; permits investigation by the Secretary of State; authorizes the issuance of cease and desist orders and injunctions; and provides criminal and civil penalties for violation of its provisions." J.R. Nolan & L.J. Sartorio, Criminal Law § 533 (3d ed. 2001).

§ 771(2)." L. Loss, *supra* at official comment to § 410 (*a*), at 146. See *id.* at draftsmen's commentary to § 410 (*a*), at 147 ("The resemblance to § 12 [2] of the Securities Act of 1933 will once more make for an interchangeability of federal and state judicial precedence in this very important area"). Accordingly, we look to Federal decisions under § 12(2), as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of G. L. c. 110A, § 410 (*a*) (2).

We begin with the general purposes of G. L. c. 110A, § 410 (*a*) (2). The statute's thrust is both "redressive" and "preventive." Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 227 (1933) (Shulman). It aims, of course, to compensate the buyer for a loss.[16] More importantly, it creates a strong incentive for sellers of securities to disclose fully all material facts about the security. Section 410 (*a*) (2) "provide[s] a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser," regardless of the actual cause of the investor's loss. *Casella* v. *Webb*, 883 F.2d 805, 809 (9th Cir. 1989) (construing § 12[2] of the Securities Act of 1933). See Kaminsky, An Analysis of Securities Litigation Under Section 12 (2) and How it Compares with Rule 10b-5, 13 Hous. L. Rev. 231, 239 (1976) ("§ 12 [2] is designed to induce sellers to be assiduous in insuring full disclosure to the buyer by threatening the seller with liability almost as an insurer in the event that there has been any material inaccurate disclosure or nondisclosure in the sale traceable in any way to the seller's carelessness or affirmative wrongdoing"); J.C. Long, Blue Sky Law, *supra* at § 9:24, at 9-38 ("The Securities Act was intended to reverse the age-old concept of caveat emptor and replace it with the concept of caveat venditor or seller beware"). The "[a]ct seeks not only to secure accuracy in the information that is volunteered to investors, but

---

[16]General Laws c. 110A, § 410 (*a*) (2), allows the investor "to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition."

also, and perhaps more especially to compel disclosure of significant matters that were heretofore rarely, if ever, disclosed." Shulman, *supra* at 227 (discussing Federal law).

Thus, the act provides strong protections for a buyer who received misleading information from a seller of securities. While not imposing strict liability on the seller for untrue statements or omissions, it holds the seller to the heavy burden of proof "that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." G. L. c. 110A, § 410 (*a*) (2). See J.C. Long, Blue Sky Law, *supra* at § 9:23, at 9-35 (defendant held to "inverse negligence standard" that is "a very difficult defense to sustain").

The plaintiff's burden is considerably lighter. It is enough for the plaintiff to establish that (1) the defendant "offers or sells a security"; (2) in Massachusetts[17]; (3) by making "any untrue statement of a material fact" or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or "in the exercise of reasonable care [would] have known," of the untruth or omission. G. L. c. 110A, § 410 (*a*) (2). See *Wright* v. *National Warranty Co.*, 953 F.2d 256, 262 n.3 (6th Cir. 1992) (listing elements of § 12[2] claim); *Adams* v. *Hyannis Harborview, Inc.*, *supra* at 686 (listing elements of § 410 [*a*] [2] claim); J.C. Long, Blue Sky Law, *supra* at § 9:24 (listing elements of Uniform Securities Act claim). Oral as well as written material misstatements are actionable. See 15 U.S.C. § 77*l*(2) ("offers or sells a security . . . by means of a prospectus or oral communication"); *Mid-America Fed. Sav. & Loan Ass'n* v. *Shearson/American Express Inc.*, 886 F.2d 1249, 1255 (10th Cir. 1989) (interpreting "untrue statement of a material fact" under Oklahoma Securities Act to apply to both oral communications and written prospectus); L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 410 (*a*) (2), at 148

[17]One difference between § 12(2) of the Securities Act of 1933 and G. L. c. 110A, § 410 (*a*) (2), is the jurisdictional requirement. Under Federal law, the defendant must have offered or sold the security "by the use of any means of communication in interstate commerce." See, e.g., *Wright* v. *National Warranty Co.*, 953 F.2d 256, 262 n.3 (6th Cir. 1992).

(1976) (noting that "for clarity's sake, it would be better" if statute explicitly stated "by the use of any written or oral communication which contains any untrue statement").

There are other factors providing substantial protection to a buyer of securities who receives any false or misleading information. The plaintiff does not need to prove either negligence or scienter to meet his burden of proof. J.C. Long, Blue Sky Law, *supra* at § 9:23, at 9-34.1. Moreover, because G. L. c. 110A, § 410 (*a*) (2), holds the seller liable for inaccurate disclosure or nondisclosure of material information, "[f]oremost among the elements that the buyer does not have to prove is reliance."[18] Kaminsky, An Analysis of Securities Litigation Under Section 12 (2) and How it Compares with Rule 10b-5, 13 Hous. L. Rev. 231, 264-265 (1976). The buyer's sophistication is also irrelevant to his claim. See *MidAmerica Fed. Sav. & Loan Ass'n* v. *Shearson/American Express Inc.*, *supra* at 1256 (distinguishing 17 C.F.R. § 240.10b-5 claim, where reliance is element, from § 12[2] claim, where reliance is not element); *Wright* v. *National Warranty Co.*, 953 F.2d 256, 262 (6th Cir. 1992) ("Section 12 [2], on the other hand, has no requirement of justifiable reliance . . . a purchaser's investment sophistication is immaterial to a [§] 12 [2] claim"); L. Loss, *supra* at draftsmen's commentary to § 410 (*a*) (2), at 148 ("The 'by means of' clause . . . is not intended as a requirement that the buyer prove reliance on the untrue statement or the omission. He must show only that he did not know of it"). Nor does the buyer have any duty to investigate or to "verify a statement's accuracy." *MidAmerica Fed. Sav. & Loan Ass'n* v. *Shearson/American Express Inc.*, *supra* at 1256. The buyer needs only to show "lack of knowledge of a misleading statement or omis-

---

[18]Contrary to the defendants' argument, *Kennedy* v. *Josephthal & Co.*, 814 F.2d 798 (1st Cir. 1987), does not hold otherwise. The case does not establish reliance as an element of a § 12(2) claim, but considers "reasonable reliance" only as to when the plaintiff is on inquiry notice that the statute of limitations period had commenced on its § 12(2) claim. *Id.* at 803. To the extent that *In re Choinski*, 214 B.R. 515, 523 (Bankr. 1st Cir. 1997), relies on *Kennedy* v. *Josephthal & Co.*, *supra*, to read a reliance element into a § 410 (*a*) (2) claim, it is incorrect.

sion in order to·prevail."[19] *Id.* at 1254. "All that is required is ignorance of the untruth or omission." *Sanders* v. *John Nuveen & Co.*, 619 F.2d 1222, 1229 (7th Cir. 1980), cert. denied, 450 U.S. 1005 (1981).

As a counterweight to its consumer-oriented focus, the act contains several provisions favoring sellers. First, it holds the plaintiff to an abbreviated limitations period.[20] Second, it specifically allows for two affirmative defenses in addition to a direct attack on one of the prima facie elements of a § 410 (*a*) (2) claim, i.e., the defendant was not a "seller" or did not offer securities "in Massachusetts." It "preclude[s] recovery whenever a plaintiff [buyer] actually knows that a representation is false or knows that existing information has been withheld." *Haralson* v. *E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1032 & n.10 (5th Cir. 1990), overruled in part by *Gustafson* v. *Alloyd Co.*, 513 U.S. 561 (1995). See *Mayer* v. *Oil Field Sys. Corp.*, 803 F.2d 749, 755-756 (2d Cir. 1986) (defendants not liable where plaintiff testified in deposition to reading prospectus and thus had knowledge of fact misrepresented). And it provides that the defendant is not liable if he "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." G. L. c. 110A, § 410 (*a*) (2). *Adams* v. *Hyannis Harborview, Inc.*, 838 F. Supp. 676, 688 (D. Mass. 1993). Finally, the act limits the buyer's remedy to recision (returning

---

[19]See *Casella* v. *Webb*, 883 F.2d 805, 809 (9th Cir. 1989) ("Constructive knowledge cannot bar a purchaser's recovery under [§] 12[2]. . . . Sellers are charged with constructive knowledge under [§] 12[2], but purchasers are not"). Because "[c]onstructive knowledge, which plaintiff might have acquired by exercising ordinary care, will not preclude him from recovery," *id.*, quoting 3 A. Bromberg & L. Lowenfels, Securities Fraud and Commodities Fraud § 8.4(317), at 204.14-204.15 (1986), this case cannot be resolved on the ground that Marram should have known that Kobrick's oral statements were wrong based on the subsequent statements in the offering memorandum and subscription agreement.

[20]The plaintiff is on inquiry notice from the time a reasonable investor would have noticed something was "amiss," e.g., when he obtained a prospectus. *Kennedy* v. *Josephthal & Co.*, *supra* at 802-803.

Originally, the limitations period for claims under G. L. c. 110A was two years. St. 1972, c. 694, § 1. In 1991, the Legislature extended the limitations period to four years. St. 1991, c. 490, § 7. Under Federal law, the limitations period for § 12(2) claims is one year from the time the buyer is on notice, but in no event more than three years. 15 U.S.C. § 77m.

buyer to status quo). See G. L. c. 110A, § 410 (a) (2) ("Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition"). Contract damages are not recoverable, nor are punitive or multiple damages. *Cabot Corp.* v. *Baddour*, 394 Mass. 720, 724 (1985).

Against this background we turn to the merits of the defendants' motion to dismiss the securities claim. The defendants assert that, as a matter of law, they are immune from the plaintiff's claims because (1) Marram purchased shares in the offshore fund solely on the basis of written representations contained in documents, whose truth is uncontested, (2) Marram's sophistication and equal bargaining power are relevant to the applicability of the integration clause, and (3) the defendants could not possibly have been aware that Marram secretly purchased the securities in reliance on preinvestment oral representations as well as on the documents. These are contract defenses. Were this a contract action, they might have merit. But it is not. As we have seen, reliance and sophistication of the buyer are not elements of this statutory claim. And the existence of contradictory written statements, in an integration clause or otherwise, does not provide a defense to the charge of preinvestment materially misleading oral statements. See, e.g., *MidAmerica Fed. Sav. & Loan Ass'n* v. *Shearson/American Express, Inc.*, *supra* at 1256 (liability even where misleading oral statements corrected by written prospectus); *Wright* v. *National Warranty Co.*, *supra* at 262 ("Section 12 [2], on the other hand, has no requirement of justifiable reliance on the part of a purchaser. Because of this, a purchaser's investment sophistication is immaterial to a [§] 12 [2] claim"). Indeed, to permit the seller of securities to discharge, or to defeat, his statutory obligation of truthfulness to the buyer merely by attaching an integration clause to a subscription agreement would enfeeble the statute.

In any event, in this case it is far from obvious that the representations in the offering memorandum and the subscription agreement contravene the specific, detailed oral representations that Kobrick is alleged to have made to Marram. We note,

for example, that Kobrick allegedly told Marram that the offshore fund was "diversified" in a "variety of industries." This oral representation is echoed in the statements in the offering memorandum, quoted above, i.e., that the offshore fund "will hold a diversified portfolio of securities" and that the offshore fund "expects to invest in companies of all sizes and a variety of industries." To be sure, the offering memorandum also represents that the investment manager "may" concentrate holdings in one industry in order to maximize returns, but such statements do not refute the specific representations about diversification that Kobrick made to Marram during their preinvestment meeting and that are echoed elsewhere in the offshore fund's documents. At trial the defendants may wish to introduce the written representations in the offshore documents as evidence to refute Marram's allegations. See *Meason* v. *Gilbert*, 226 Ga. 862, 864 (1976) (integration provision has "evidentiary value on the question of whether representations were made to the purchaser inducing the stock purchase other than those contained in the prospectus"). However, the mere existence of the integration clause is insufficient, in itself, to support the defendants' motion to dismiss the securities claim.

We find further support for our conclusion that an integration clause cannot release the defendants from liability under G. L. c. 110A, § 410 (*a*) (2), in another section of the Uniform Securities Act. General Laws c. 110A, § 410 (*g*),[21] prohibits any person from waiving compliance with any provision of the Act.[22] See L. Loss, Commentary on Uniform Securities Act draftsmen's commentary to § 410 (*g*), at 151 (1976) (provisions prohibiting waiver "are clearly advisable in view of the frequent disparity of bargaining power and sophistication between sellers and buyers"). Other jurisdictions have held that written contract

---

[21]General Laws c. 110A, § 410 (*g*), states: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any rule or order hereunder is void."

[22]"The foregoing rule is obviously a specific application of the general doctrine, widely accepted, that, since the requirements of a statute enacted for the public good may not be nullified or varied by private contract, the donee of a private right created by such a statute does not have legal power to make an anticipatory waiver of such right." Annot., 61 A.L.R.2d 1308, 1308 n.1 (1958).

terms, including an integration clause, cannot be construed to waive the plaintiff's rights under Federal or State securities law. "To permit this remedy to be 'waived' or 'released' prior to or contemporaneously with the sale of unregistered securities would thwart the very objective of the statute and violate the declared public policy of this State. Such a holding would pave the way for the virtual nullification of this important legislative enactment." *Foreman* v. *Holsman*, 10 Ill. 2d 551, 554 (1957) (written agreement contained release of liability from provisions of Illinois Securities Act). See, e.g., *FS Photo, Inc.* v. *Picturevision Inc.*, 61 F. Supp. 2d 473, 480 (E.D. Va. 1999) (merger clause in settlement agreement, "while not an explicit waiver of compliance with the Securities Act, is nonetheless covered by § 78cc[a] [the equivalent Federal statute] and is thus ineffective to bar plaintiffs' federal securities fraud claims"); *Doody* v. *E.F. Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984) ("enforcing an indemnity provision . . . would discourage prospective plaintiffs from bringing securities fraud actions whenever there is an integration clause in a subscription agreement. . . . Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision"); *Meason* v. *Gilbert, supra* ("We also reject the seller's contention that the [integration] clause as a matter of law estops the purchaser from raising any alleged oral misrepresentations"). See also *Jones* v. *Miles*, 656 F.2d 103, 106-107 (5th Cir. 1981) (waiver by estoppel is waiver defense "not available in a case involving only violations of Georgia and/or federal securities laws").[23]

Finally, the defendants argue that the securities count must be dismissed because the alleged oral statements Kobrick made to Marram were not as a matter of law material, an element of a § 410 (*a*) (2) claim.[24] The test whether a statement or omission is material is objective: "there must be a substantial likelihood

[23]In light of our conclusion concerning waiver, we need not consider further the defendants' argument that, in acknowledging in writing that he had read and understood the integration clause, Marram wrongfully brought claims based on Kobrick's oral statments.

[24]The misrepresentation or omission need only be material; it need not be the cause of any loss. See Kaminsky, An Analysis of Securities Litigation Under Section 12(2) and How it Compares with Rule 10b-5, 13 Hous. L. Rev.

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Craftmatic Sec. Litig.* v. *Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989), quoting *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976). The determination of materiality is a mixed question of law and fact ordinarily decided by the trier of fact. "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *TSC Indus., Inc.* v. *Northway, Inc., supra* at 450. *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir.), cert. denied, 506 U.S. 934 (1992). *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993), cert. denied sub nom. *Gollomp* v. *Trump*, 510 U.S. 1178 (1994).

Here the alleged oral misrepresentations relate to the diversification of the offshore fund, the industries in which the offshore fund was invested, the concentration of the offshore fund in certain industries, and the suitability (risk profile) of the offshore fund given the investment goal of the investor (capital preservation). It is difficult to imagine concerns more material to the reasonable investor when considered in the total mix of information that drives an investment decision. See *DeBruyne* v. *Equitable Life Assur. Soc'y*, 920 F.2d 457, 465-466 (7th Cir. 1990) ("allegations as to . . . risk and volatility . . . appear more likely to raise a genuine issue of fact as to misrepresentation," but dismissing securities claim for other reasons); *Casella*

231; 264-265 (1976). See also *Metromedia Co.* v. *Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992), cert. denied, 508 U.S. 952 (1993), quoting *Jackson* v. *Oppenheim*, 533 F. 2d 826, 830 n.8 (2d Cir. 1976) ("The section requires only 'some' causal connection between the alleged communication and the sale, 'even if not "decisive" ' "). In general, the statement or omission must concern a fact, and not an opinion or belief, *Craftmatic Sec. Litig.* v. *Kraftsow*, 890 F.2d 628, 642-643 (3d Cir. 1989), unless such an opinion is inconsistent with facts known at the time they are made, *Glassman* v. *Computervision Corp.*, 90 F.3d 617, 627 (1st Cir. 1996). See *Casella* v. *Webb*, 883 F.2d 805 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation").

v. *Webb*, 883 F.2d 805, 807 (9th Cir. 1989), quoting *Admiralty Fund* v. *Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir. 1982) ("test for materiality is 'whether the existence or nonexistence of the fact in question is a matter to which a reasonable man would attach importance in determining his choice of action' "); *Miller* v. *New Am. High Income Fund*, 755 F. Supp. 1099, 1104-1105 (D. Mass. 1991), aff'd sub nom. *Lucia* v. *Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994) (statements that "did not accurately reflect the investments that the [defendants] would be making," statements about 'techniques' to reduce risk," and statements that led an investor to believe the fund would not invest in "a riskier segment of the market" form a sufficient basis for claim under § 12[2]).

The plaintiff, in short, has sufficiently alleged a claim under G. L. c. 110A, § 410 (*a*) (2), to survive a motion to dismiss for failure to state a claim. See Mass. R. Civ. P. 12 (b) (6).

4. *Negligent misrepresentation.* Although it has no bearing on a claim pursuant to G. L. c. 110A, § 410 (*a*) (2), justifiable reliance is integral to a claim for negligent misrepresentation.[25] Reliance normally is a question for a jury. *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 257 (1999). However, in some circumstances a plaintiff's reliance on oral statements in light of contrary written statements is unreasonable as a matter of law. See, e.g., *Sound Techniques, Inc.* v. *Hoffman*, 50 Mass. App. Ct. 425, 433-434 (2000) ("no reasonable basis [existed] for ignoring the plain language of the merger clause, in which [the plaintiff] agreed that it was entering into the contract free from influence by or in reliance upon any representations other than those set out in the contract"). Our courts have so held, but generally only after some record has

---

[25]A defendant is liable for negligent misrepresentation if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information. *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 587 (1996), quoting Restatement (Second) of Torts § 552(1) (1977). Negligent misrepresentation differs from an action for fraud because "liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff." *Kitner* v. *CTW Transp., Inc.*, 53 Mass. App. Ct. 741, 749 (2002).

been established on a motion for summary judgment or after a trial. See, e.g., *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 438 Mass. 459, 468 (2003) (summary judgment appropriate because it was unreasonable to rely on oral statements that conflicted with written quotation, where "[a]ll that was required of [the plaintiffs' representatives] was that they read the document to ascertain the obvious"); *Mahaney* v. *John Hancock Mut. Life Ins. Co.*, 6 Mass. App. Ct. 919, 920 (1978), quoting *Yorke* v. *Taylor*, 332 Mass. 368, 374 (1955) (after trial, court held as matter of law that it was unreasonable to rely on oral statements that were "preposterous or palpably false" in face of contradictory written statements). See also *Sands* v. *Ridefilm Corp.*, 212 F.3d 657, 665 (1st Cir. 2000) (summary judgment affirmed where "[i]t was unreasonable for the plaintiff to rely on the alleged oral representations because of the express written word"); *Triforo* v. *New York Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988) (summary judgment appropriate "[w]hen a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law. . . . Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying").

We do not agree with the defendants and the Superior Court judge that the issue of Marram's reliance on the oral representations alleged in this case is ripe for decision at this preliminary stage. First, as this appeal concerns a motion to dismiss, there is no factual record that the specific oral representations Kobrick allegedly made to Marram were contradicted elsewhere. Additionally, extinguishing the plaintiff's negligent representation claim would be inappropriate because the subscription agreement implicitly acknowledges Kobrick's preinvestment oral statements to be part of the mix of preinvestment information available for the prospective buyer to weigh. The private offering memorandum states that the offshore fund "will make available to each prospective investor . . . the opportunity to ask questions of, and receive answers" from the offshore fund administrator concerning "the terms and conditions of this offering of Shares," and from the offshore fund manager concerning "the investment program of the Fund." The private offering

memorandum further states that the administrator will provide the investor, on request, with such additional information "necessary to verify the accuracy" of the memorandum as the administrator "could acquire . . . without unreasonable effort or expense." See also note 10, *supra*. Implicit in these representations is the guarantee that whatever information the agents of the offshore fund provide will be reliable. In essence, the subscription agreement and private offering memorandum implicitly vouch for the accuracy of Kobrick's preinvestment oral statements to Marram about the offshore fund. In such circumstances, and without any factual record developed through discovery, we cannot conclude that, as a matter of law, no factual scenario exists under which the plaintiff might establish a claim of negligent misrepresentation.

5. *General Laws c. 93A claim.* The third count of the complaint alleges violations of G. L. c. 93A, § 11,[26] unfair or deceptive trade practices resulting in proximate and foreseeable losses. The claim applies to both Kobrick's preinvestment and postinvestment statements to Marram. The Superior Court judge reasoned that the postinvestment statements were not actionable because (1) they were statements of opinion, not fact, and (2) the plan redeemed its shares at the earliest date it could under the subscription agreement and thus could not establish actual damages, as required by the statute. The judge also agreed with the defendants that the integration clause rendered the preinvestment statements immaterial. We conclude that the plaintiff may maintain a cause of action under G. L. c. 93A, § 11, as to each class of statement.

In a G. L. c. 93A claim, the existence of unfair or deceptive acts ordinarily must be determined from the circumstances of each claim. *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 615-

---

[26]General Laws c. 93A, § 11, states, in pertinent part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

General Laws c. 93A, § 1 (*b*), defines "[t]rade" and "commerce" as including "any security as defined in subparagraph (*k*) of [G. L. c. 110A, § 401]."

616 (1983). Because a negligent misrepresentation may be so extreme or egregious as to constitute a violation of G. L. c. 93A, § 11, and because Marram's claim for negligent misrepresentation remains viable while the specific content is yet to be explored, the G. L. c. 93A claim as to preinvestment statements must be reinstated. See *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 261 (1999), quoting *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 235 (1985) ("negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice under G. L. c. 93A, § 2 [*a*]").

Marram also has properly alleged a claim for unfair and deceptive trade practices for the postinvestment statements made by Kobrick. Marram avers that Kobrick made postinvestment misrepresentations about the offshore fund's investment portfolio and misleadingly offered to forward him a list of the offshore fund's holdings and an analysis of its underperformance, causing Marram to rescind the December 11, 2000, liquidation order. On the facts alleged, it cannot be said conclusively at this early stage of the proceedings that such statements are unactionable "mere puffery," as the defendants claim. See *Spence* v. *Boston Edison Co.*, *supra* at 616 ("Courts have deliberately avoided setting down a clear definition of conduct constituting a violation of G. L. c. 93A").

Nor can we say as a matter of law that in no set of circumstances will the plaintiff be able to establish that the plan suffered actual damages as a result of the defendants' postinvestment actions. The defendants maintain, and the judge concluded, that the plan could not have sustained cognizable damages because the earliest it could have redeemed shares after notice was the quarter ended March 31, 2001 (that is, the last day of the first fiscal quarter after a one-year mandatory holding period) and the plaintiff requested redemption of the plan's shares on April 3, 2001.[27] But Marram did in fact request redemption on an earlier date, December 11, 2000. He alleges that further false information from Kobrick caused him to

---

[27]The subscription agreement states: "The Investor understands that it may not redeem Shares within the initial twelve months after it purchases such Shares and that, at the end of the twelve month period, it will generally have

rescind that instruction. Had he not done so, the plan's investment could have been liquidated earlier. In any event, just because the plan's investment may have been liquidated soon after the end of the March quarter does not mean that the plan suffered no actual damages from holding its 2,000 shares beyond the end of the March quarter.

6. *Conclusion.* We vacate the judge's decision allowing the motion to dismiss and remand the matter to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

the right to redeem all or part of its Shares on the last business day of each quarter upon 30 days prior written notice."

The offering memorandum contains slightly different language: "Generally, Shares may be redeemed by a shareholder on the last business day of each fiscal quarter occurring *on or after* the end of the twelve month period following the initial acquisition of Shares by such shareholder on 30 days prior written notice to the Fund (subject to the sole discretion of the Board of Directors to waive such notice), or at such other times, and upon such terms of payment, as may be approved by the Board of Directors, in its sole discretion" (emphasis added).