van Gestel, Allan, J.
These consolidated matters are before the Court on a request by William Francis Galvin, Secretaiy of the Commonwealth of Massachusetts (the “Secretaiy), pursuant to G.L.c. 110A, sec. 407(c) for an order requiring The Gillette Company (“Gillette”) to comply with a certain subpoena duces fecumissued on March 23, 2005 (the “Subpoena"). The request is opposed on various grounds challenging the Secretary’s standing and jurisdiction to act in the circumstance presented.

BACKGROUND

On January 27, 2005, Gillette, The Procter & Gamble Company (“Procter & Gamble”) and Aquarium Acquisition Corp. (“Aquarium”) entered into an Agreement and Plan of Merger (the “Agreement”). Under the Agreement, Procter & Gamble, an Ohio corporation based in Cincinnati, Ohio, acting through its wholly-owned subsidiary Aquarium, agreed to merge with Gillette, a Delaware corporation based in Boston, Massachusetts. Following the merger the surviving corporation will be Gillette; and Gillette shareholders will receive 0.975 shares of Procter & Gamble common stock for each share of Gillette common stock. There are many things that must be accomplished before the merger is complete, including certain regulatory approvals and, most importantly, approval after notice and a vote by both the Gillette and the Procter & Gamble stockholders. It is anticipated that, if approved, the merger will close later this year.
On March 14, 2005, Procter & Gamble filed with the Securities & Exchange Commission (“SEC”) a preliminary Form S-4 Registration Statement under the Securities Act of 1933, since updated; and Procter & Gamble and Gillette filed a Joint Proxy Statement, both relating to the terms of the merger and the interests of James M. Kilts, Chairman, President and Chief Executive Officer of Gillette, and the fairness opinions with respect to the merger.
Procter & Gamble’s fairness opinion was rendered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (“Merrill Lynch”), and Gillette’s fairness opinions were rendered by Goldman, Sachs & Co. (“Goldman, Sachs”) and UBS Securities, LLC (“UBS”). All three of the opinion givers opined that based upon and subject to the factors, assumptions, procedures, limitations and qualifications set forth therein, “the exchange ratio of 0.975 of a share of Procter & Gamble common stock to be received for each share of Gillette common stock pursuant to the merger agreement was fair from a financial point of view to the holders of shares of Procter & Gamble and Gillette common stock.
G.L.c. 110A is the Massachusetts version of the Uniform Securities Act (the “Act”). Under G.L.c. 110A, secs. 101, 102, 201, 204, 401 and 407, the Secretary has certain statutoiy authority which he seeks to assert regarding aspects of the merger by Gillette that are related to the fairness opinions rendered to it. In the exercise of that authority, on March 23, 2005, the Secretary caused the duces tecum Subpoena in issue to be served on Gillette. The Subpoena demands the production of a wide array of material involving the merger, Gillette itself, and the possible impact of the merger. Four broad categories of information are included within the documents to be produced: (1) “Valuation of Gillette’’ — that is, the potential value of Gillette in the merger as determined by Gillette and its bankers; (2) “Events Leading to the Merger with Procter & Gamble(3) “Fairness Opinions” — that is, information relating to the preparation of the fairness opinions by UBS and Goldman, Sachs; and (4) “Impact of the Merger on the Gillette Workforce.”[1]
Gillette has already, on a voluntary basis, provided to the Secretaiy a substantial amount of information relating to the merger. Further, of course, the SEC filings by Procter & Gamble and Gillette, which are extensive, provide for the Secretaiy a significant amount of detail on all aspects of the merger. Thus, *292 although Gillette is willing to provide still additional information to the Secretary on a voluntary basis, it refuses to do so under the formal subpoena process.

DISCUSSION

The First Circuit Court of Appeals has had the opportunity to speak regarding subpoena enforcement proceedings not significantly different from that before this Court. Judge Selyea, in addressing an Internal Revenue Service subpoena, said:
The IRS had broad authority to issue summonses under [the Internal Revenue Code]... Enforcement proceedings are designed to be summary, see Donaldson v. United States, 400 U.S. 517, 529 . . . and the court’s role is simply to ensure that the IRS is using its broad authority in good faith and compliance with the law. ... Thus, when a challenge to a summons is lodged, the IRS must only satisfy the court that (1) its investigation is being conducted pursuant to a proper purpose, (2) the information sought in the summons is (or may be) relevant to that purpose, (3) the information is not already within the IRS’s possession, and (4) all legally required administrative steps have been followed.
United States v. Gertner, 65 F.3d 963, 966 (1st Cir. 1995).
G.L.c. 110A “shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with related federal regulation.” G.L.c. 110A, sec. 415.
G.L.c. 110A, sec. 407(a) reads:
The secretary in his discretion (1) may make such public or private investigations within or outside the commonwealth as he deems necessary to determine whether any person has violated or is about to violate any provision of this chapter or any rule or order hereunder, or to aid in the enforcement of this chapter or in prescribing rules and forms hereunder, (2) may require or permit any person to file a statement in writing, under oath or otherwise as the secretary determines, as to all facts and circumstances concerning the matter to be investigated, and (3) may publish information concerning any violation of this chapter or any rule or order hereunder.
The discretionary powers granted to the Secretary by sec. 407(a) are exceptionally broad. This, of course, is consistent with general principles of administrative law. See, e.g., Lindsay v. Department of Social Services, 439 Mass. 789, 797 (2003); L.G.G. v. Department of Social Services, 429 Mass. 1008, 1009 (1999); Boston Preservation Alliance, Inc. v. Environmental Affairs, 396 Mass. 489, 496 (1986); Levy v. Board of Registration and Discipline in Medicine, 378 Mass. 519, 525 (1979).
“Where the means of fulfilling [a legal] obligation is within the discretion of a public agency, the courts normally have no right to tell that agency how to fulfill its obligation.” Matter ofMcKnight, 406 Mass. 787, 792 (1990).
On the other hand, the Secretary is not invested with the powers of “a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness.” Cardozo, ‘The Nature of the Judicial Process,” p. 141, (Yale University Press, 1921). Rather, to the extent the powers he seeks to exercise are specifically constrained by the legislation he cites as their source, he ought not be free to pursue them. Here, Gillette argues that under G.L.c. 110A mergers are explicitly excluded from the investigative and enforcement ambit of the Secretary.
Gillette points out that the Secretary is charged with prohibiting fraud “in connection with the offer, sale, or purchase of any security” in Massachusetts. G.L.c. 110A, sec. 101. He also is expected to prohibit fraud by any person who is paid for “advising” another “as to the value of securities or their purchase or sale.” G.L.c. 110A, sec. 102. The Act defines a sale of securities as “every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.” G.L.c. 110A, sec. 401 (i)(l). An offer is “every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.” G.L.c. 110A sec. 401(i)(2).
Certain transactions, however, are expressly removed from the scope of the Uniform Securities Act. Mergers are included among those excluded transactions. G.L.c. 110A, sec. 401(i)(6)(C) reads: The terms defined in this subsection do not include . . . (C) any act incident to a class vote by stockholders, pursuant to the certificate of incorporation or the applicable corporation statute, on a merger, consolidation, reclassification of securities, or sale of corporate assets in consideration of the issuance of securities of another corporation.” (Emphasis added.)
Writing shortly after the passage of the Uniform Securities Act, upon which c. 110A is modeled, one of its drafters explained:
[Section 401(i)(6)(C) incorporates] all of the SEC’s “no-sale theory” and more. That is, the exclusion from the definition of “sale” not only does away with the need for registration of the securities to be issued ... but removes the transactions incident to such a class vote from the fraud provisions of the act. Moreover, the exclusion is absolute, and not subject to change in administrative attitudes.
Edward M. Cowett, Reorganizations, Consolidations, Mergers and Related Corporate Events Under the Blue-Sky Laws, 13 Bus. Law. 418, 421 (1958). See also Note, The Uniform Securities Act, 12 Stan.L.Rev. 103, 129 (1959) (since mergers “are excluded from the definition of sale, the antifraud provisions are inapplicable as well”).
*293 Indeed, the Secretary's own regulations include within their definition of “merger” the very kind of reverse triangular merger “transaction in which a subsidiary of the issuer is merged with another corporation” like that of Aquarium’s merger into Gillette in issue here. 950 C.M.R. sec. 14.401.
On the other hand, “[wjhere a court contemplates an injunctive order to compel an executive agency to take specific steps, it must tread cautiously in order to safeguard the separation of powers mandated by art. 30 of the Declaration of Rights of the Massachusetts Constitution.” Smith v. Commissioner of Transitional Assistance, 431 Mass. 638, 651 (2000). A Court cannot constitutionally regulate the administration of an executive or his division where such administration involves the exercise of discretion. See Stretch v. Timilty, 309 Mass. 267, 270-71 (1941).
The Supreme Judicial Court recently discussed the Massachusetts version of the Uniform Securities Act. In general, the SJC said:
The Legislature has directed that we interpret the act in coordination with the Securities Act of 1933. See St. 1972, c. 694 (enacting G.L.c. 110A, sec. 415, and directing the court “to coordinate the interpretation and administration of this chapter with the related federal legislation”). See also Adams v. Hyannis Harborview, Inc., 838 F.Sup. 676, 684 n. 9 (D.Mass. 1993) (Massachusetts securities laws “are substantially similar to the Federal securities laws and therefore decisions construing the Federal statutory language are applicable to the state statute as well”). General Laws c. 110A, §410(a)(2), “is almost identical with sec. 12(2) of the Securities Act of 1933, 15 U.S.C. sec. 771(2).” L. Loss, supra at official comment to sec. 410(a), at 146. See id. at draftsmen’s commentary to sec. 410(a), at 147 (“The resemblance to sec. 12(2] of the Securities Act of 1933 will once more make for an interchangeability of federal and state judicial precedence in this very important area”). Accordingly, we look to Federal decisions under sec. 12(2), as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of G.L.c. 110A, sec. 410(a)(2).
We begin with the general purposes of G.L.c. 110A, sec. 410(a)(2). The statute’s thrust is both “redressive” and “preventive.” Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 227 (1933) (Shulman). It aims, of course, to compensate the buyer for a loss. More importantly, it creates a strong incentive for sellers of securities to disclose fully all material facts about the security. Section 410(a)(2) “provide(s) a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser,” regardless of the actual cause of the investor’s loss. Casella v. Webb, 883 F.2d 805, 809 (9th Cir. 1989) (construing sec. 12(2] of the Securities Act of 1933). See Kaminsky, An Analysis of Securities Litigation Under Section 12(2) and How it Compares with Rule 10b-5, 13 Hous.L.Rev. 231, 239 (1976) (“sec. 12[2] is designed to induce sellers to be assiduous in insuring full disclosure to the buyer by threatening the seller with liability almost as an insurer in the event that there has been any material inaccurate disclosure or nondisclosure in the sale traceable in any way to the seller’s carelessness or affirmative wrongdoing”); J.C. Long, Blue Sky Law, supra at sec. 9:24, at 9-38 (“The Securities Act was intended to reverse the age-old concept of caveat emptor and replace it with the concept of caveat venditor or seller beware”). The “[a]ct seeks not only to secure accuracy in the information that is volunteered to investors, but also, and perhaps more especially to compel disclosure of significant matters that were heretofore rarely, if ever, disclosed.” Shulman, supra at 227 (discussing Federal law).
Thus, the act provides strong protections for a buyer who received misleading information from a seller of securities. While not imposing strict liability on the seller for untrue statements or omissions, it holds the seller to the heavy burden of proof “that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.” G.L.c. 110A, sec. 410(a)(2). See J.C. Long, Blue Sky Law, supra at sec. 9:23, at 9-35 (defendant held to “inverse negligence standard” that is “a veiy difficult defense to sustain”).
Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50-52 (2004).
While the SJC in Marram was dealing with sec. 410(a) (2) of the Uniform Securities Act, which provides rights for a defrauded or misled buyer of a security, the thrust behind c. 110A for all purposes seems apparent. The legislative intention is clear that the statute, like its predecessor, be comprehensive in scope. Giordano v. Auditore, 355 Mass. 254, 257 (1969). This Court should have these teachings in mind when responding to the requests in this case.
Although there is a serious question as to whether Massachusetts law applies at all, Gillette being a Delaware corporation, the merger being expressly covered by Delaware law, and there already being pending three class-actions challenging the merger in the Delaware Chancery Court, the Secretary’s only power is to be found in the law of Massachusetts. Consequently, this decision is based principally on Massachusetts law.
The request by the Secretary for enforcement is directed solely at the Subpoena issued to Gillette. Gillette, in its claim for declaratory relief, however, argues that the subpoenas to UBS and Goldman, Sachs also should be quashed. The position of Gillette and the positions of UBS and Goldman, Sachs with *294 regard to the Secretary’s authority, however, are not the same.
Gillette is only a party to a proposed merger. UBS and Goldman, Sachs are regulated “persons” receiving compensation for advisory opinions in reference to an exchange of stock in the proposed merger.
As noted above, G.L.c. 110A, sec. 401(i)(6)(C) exempts mergers from regulation by the Secretary. Consequently, the Subpoena to Gillette, if for that purpose, is without authority. Much of what has appeared in the press — from both Gillette and the Secretary — has related to the merger and its potential effect on Massachusetts, including Gillette employees in Massachusetts, and also to the large payments to be made to Gillette corporate officers as a result of the merger. It is this Court’s conclusion that there does not appear to be any statutory authority for the Secretary to investigate these issues unless there is in some way, not readily apparent, some relevance to the activities of UBS and Goldman, Sachs in preparing their fairness opinions. Because of this conclusion, the Court sees no need to address much of what is included in the memorandum filed by Gillette in the late morning on April 27, 2005.
UBS and Goldman, Sachs, on the other hand, are registered entities subject to c. 110A, sec. 201 and, presumably, subject to the extensive oversight authority of the Secretary under c. 110A, secs. 102 and 407(a). As such, the subpoenas issued to UBS and Goldman, Sachs, at least in part, may well be within the Secretary’s authority. Any challenge to those subpoenas, however, is not before this Court today.
What remains is to determine whether the Subpoena to Gillette, in any way, is appropriate and within the Secretary’s authority in connection with his investigation of the actions of UBS and Goldman, Sachs. This final inquiry leads the Court to the wording of c. 110A, sec. 407(b) and (c).
Chapter 110A, sec. 407(b) states:
For the purpose of any investigation or proceeding under this chapter, the secretary or any officer designated by him may administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, agreements, or other documents or records which the secretary deems relevant or material to the inquiry.
(Emphasis added.)
Chapter 110A, sec. 407(c) states, in material part:
In case of contumacy by, or refusal to obey a subpoena issued to, any person, the superior court for the county in which the person is found ... or transacts business, upon application by the secretary, may issue to the person an order requiring him to appear before the secretary, or the officer designated by him, there to produce documentary evidence if so ordered or to give evidence touching on the matter under investigation or in question.
(Emphasis added.)
In construing the federal analogue to sec. 407(c), the Supreme Court said:
[I]n absence of a basis for saying that its demand exceeds lawful limits (Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186) [the Commission] is entitled to the aid of the court in obtaining [records]. A refusal of the Court to enforce its prior order for the production of the documents denies the Commission that statutory relief.
Penfield Co. of California v. S.E.C., 330 U.S. 585, 591 (1947).
An assessment must be made as to what aspects, if any, in the Subpoena to Gillette relate to information deemed by the Secretary to be relevant or material to his investigation of the actions of UBS and Goldman, Sachs in rendering their fairness opinions in this matter. This assessment, however, should not be the role of the Court, although its conclusion may be subject to Court review.
In this assessment process a word or two about the role of fairness opinions in connection with mergers of a Delaware corporation like Gillette seems in order. The Delaware Supreme Court has acknowledged that Delaware law does not require a fairness opinion or an outside valuation before a board of directors can act on a merger proposal. However, “[u]nless the directors had before them adequate information regarding the intrinsic value of the Company, upon which a proper exercise of business judgment could be made, mere [advice of counsel that a fairness opinion is not required] is meaningless.” Smith v. Van Gorkum, 488 A.2d 858, 881 (1985).
Earlier in Van Gorkum, the Delaware court said:
We do not imply that an outside valuation study is essential to support an informed business judgment; nor do we state that fairness opinions by independent investment bankers are required as a matter of law. Often insiders familiar with the business of a going concern are in a better position than are outsiders to gather relevant information; and under appropriate circumstances, such directors may be fully protected in relying in good faith upon the valuation reports of their management.
Id. at 876.
Gillette also argues that the National Securities Markets Improvement Act of 1996 (“NSMIA”) 15 U.S.C. see. 77r(a)(3), preempts the Secretary's jurisdiction to review and take action with respect to the merger. While there may be preemption for a merger, this Court has serious doubts about the preemption argument with respect to what the Secretary on April 22, 2005, told this Court he is investigating. Section 18 of the Securities Act of 1933 was amended by the NSMIA to read as follows:
*295 Consistent with this section, the securities commission (or any agency or office performing like functions) of any State shall retainjurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions.
NSMIA, sec. 18(d)(1), as amending sec. 18 of the Securities Act of 1933, 15 U.S.C sec. 77r(c)(l). (Emphasis added.) See also H.R. Rep. No. 104-622 104th Cong. 2d Sess., June 17, 1996, 1996 U.S. Code Congressional and Administrative News, pp. 3877, 3896-97.
Congress, rather clearly, intended that state regulators be free in their ability to continue to investigate for fraud in connection with securities and securities transaction.
On April 22, 2005, in a filing with the Court opposing transfer of the Secretaiy’s case to the Business Litigation Session, the Secretary made the following statements:
The only issue before this Court is the Secretaiy’s request that this Court enter an order enforcing an investigatory subpoena and Gillette’s opposition to the entry of that requested order.
What this case is not about is “the form of a complex merger transaction and the application of the provisions of both state and federal securities law to the transaction” as alleged by Gillette. Subject to other regulatoiy approval, Gillette is free to merge or not with whom it chooses and the Secretary never contended otherwise. The form of the merger is completely irrelevant and unrelated to the Secretaiy’s inquiiy.
There is but one issue to be decided. Do the provisions of Gen. Laws c. 110A empower the Secretary to conduct investigations to determine whether fraud maybe present where registered broker-dealers have issued “fairness opinions” based on information provided by Gillette . . .
See Opposition to Transfer to Business Litigation Session, paras. 1 and 4. (Emphasis in original.)
Given this filing by the Secretary, which this Court accepts as a full and complete statement intended for the Court’s reliance, and upon which this Court has relied, there is nothing left in Gillette’s charges that the Secretary has other motives in pressing the present Subpoena. Indeed, until the proposed investigation is completed, no one will know whether any fraud has been uncovered in the acts of UBS or Goldman, Sachs or, if so, what steps the Secretary will take as a result. There will be plenty of time then to challenge the Secretaiy’s actions if they are different from what this Court understands them to be. In short, there is no Gertner-type pretext here.
Further, and again relying on the Secretary’s recent statement of what the investigation is all about, this Court sees nothing in that process that violates the Commerce Clause of the United States Constitution.
As noted above, the Secretary has broad powers to conduct an investigation of actions of broker-dealers registered in Massachusetts; and this Court should be chary about interfering with his discretion to do so. That said, the Court does have some obligation under G.L.c. 110A, sec. 407(c), albeit minimal, to insure that the information sought “touch(es) the matter under investigation or in question.” The Court is, after all, “not an automaton which must unquestionably compel obedience to a subpoena simply because the [Secretary] issued it.” Penfield Co., supra, 330 U.S. at 607.
As stated before, the matter under investigation seems to be “whether fraud may be present where registered broker-dealers have issued ‘fairness opinions’ based on information provided by Gillette.” The broker-dealers here are UBS and Goldman, Sachs. Gillette, however, argues that UBS and Goldman, Sachs, although admittedly registered broker-dealers in Massachusetts, were acting in their capacity as investment bankers in rendering their fairness opinions. The Court does not find this distinction persuasive at this beginning stage of the Secretary’s investigation of their actions.
Section 101 of c. 110A makes it unlawful “(1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.” These prohibitions, however, only apply “in connection with the offer, sale, or purchase of any security, directly or indirectly.” Mergers, of course, are specifically excluded from the terms “offer, sale, or purchase of any security” and not, therefore, subject to the prohibitions in sec. 101.
Section 102 makes it unlawful “for any person who receives, directly or indirectly, any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise (1) to employ any device, scheme, or artifice to defraud the other person, or (2) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person." (Emphasis added.) Again, for the reasons noted above, these prohibitions cannot relate to a “purchase or sale” that constitutes a merger. They can, however, relate to “advising ... as to the value of securities.”
Here UBS and Goldman, Sachs fall within the definition of “any person” who “receives consideration” for “advising ... as to the value of securities,” i.e., the *296 fairness opinions regarding the Gillette stock as related to the Procter & Gamble stock. The Secretary does, therefore, have the authority to investigate whether UBS or Goldman, Sachs defrauded the other person. Of course, the other person here is Gillette.
However, UBS and Goldman, Sachs also appear to have obligations to Gillette stockholders under the theories espoused by the Supreme Judicial Court in Nycal Corp. v. KPMG Peat Marwick, LLP, 426 Mass. 491, 495-99 (1998). Consequently, to this extent, it would appear that the Secretary has authority to investigate whether UBS or Goldman, Sachs employed any device, scheme, or artifice to defraud Gillette or its stockholders, or engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon Gillette or its stockholders, in connection with the fairness opinions rendered in support of the proposed merger.
An examination of the Subpoena issued to Gillette on March 23, 2005, reveals a breadth of information demanded that reaches far beyond the somewhat narrowly focused investigation that the Secretary announced to the Court in his opposition on April 22, 2005. Much of the mass of materials sought does not, facially at least, appear to touch on or be relevant or material to the matter under investigation or in question, i.e., whether fraud may be present in the UBS or Goldman, Sachs fairness opinions based on information provided by Gillette. Consequently, in its present form the Subpoena reaches too far. Further, given its complexity, this Court cannot — and should not — attempt to apply a blue pencil to the sections that appear too far reaching. This is for the discretion of the Secretary, not that of the Court. “(I]t is for the agency rather than the courts to determine in the first instance a question of coverage in the course of the preliminary investigation into possible violations.” Securities & Exchange Commission v. Brigadoon Scotch Distributing Co., 480 F.2d 1047, 1053 (2d Cir. 1973). And the Secretary does not have the burden of proving that his actions are not arbitrary or in excess of statutory authority. Attorney General v. Bodimetric Profiles, 404 Mass. 152, 157-58 (1989).

ORDER

For the foregoing reasons, this Court orders quashed the duces tecum subpoena issued to the Gillette Company on March 23,2005, by the Securities Division, Office of the Secretary of State of the Commonwealth. This order, however, is without prejudice to the Secretary, or his designate, issuing a new subpoena to Gillette which is consistent with the legal principles récited by the Court in the memorandum above.
In light of this Order, the parties are directed to submit to the Court written recommendations or contentions they believe remain for consideration in either or both of these consolidated cases. Any such recommendations or contentions should be filed on or before May 6, 2005, and should include proposed schedules for taking and completing the actions sought.

The four quoted titles are exactly as they appear in the Subpoena itself.