van Gestel, Allan, J.
These matters came before the Court at its direction for a Rule 16 conference regarding scheduling what, if anything, remains to be litigated after the entry of the Memorandum and Order of April 28, 2005 (the “Memorandum”) (19 Mass. L. Rptr. 291).[1] The parties differ widely on what remains. The Secretary of the Commonwealth (the “Secretary”) seeks further wide-ranging orders regarding compliance with a Second Subpoena and other matters occurring after the April 28, 2005 Memorandum. The Gillette Company (“Gillette”) contends that nothing remains to be litigated and that it has complied properly with all outstanding requests from the Secretary.
Certain major points of the April 28, 2005 Memorandum bear repeating.
This Court significantly relied upon an April 22, 2005 filing by the Secretary opposing transfer of his case to the Business Litigation Session, in which the Secretary made the following statements:
The only issue before this Court is the Secretary’s request that this Court enter an order enforcing an investigatory subpoena and Gillette’s opposition to the entry of that requested order.
What this case is not about is “the form of a complex merger transaction and the application of the provisions of both state and federal securities law to the transaction” as alleged by Gillette. Subject to other regulatory approval, Gillette is free to merge or not with whom it chooses and the Secretary never contended otherwise. The form of the merger is completely irrelevant and unrelated to the Secretary’s inquiry.
* * * * *
There is but one issue to be decided. Do the provisions of Gen. Laws c. 110A empower the Secretary to conduct investigations to determine whether fraud may be present where registered broker-dealers have issued “fairness opinions” based on information provided by Gillette . . .
Memorandum at p. 12.
The Court ruled:
*381 G.L.c. 110A, sec. 401(i)(6)(C) exempts mergers from regulation by the Secretary. Consequently, the Subpoena to Gillette, if for that purpose, is without authority. Much of what has appeared in the press — from both Gillette and the Secretary — has related to the merger and its potential effect on Massachusetts, including Gillette employees in Massachusetts, and also to the large payments to be made to Gillette corporate officers as a result of the merger. It is this Court’s conclusion that there does not appear to be any statutory authority for the Secretary to investigate these issues unless there is in some way, not readily apparent, some relevance to the activities of UBS and Goldman, Sachs in preparing their fairness opinions.
Memorandum at pp. 8-9.
The Court also ruled:
Section 102 [of G.L.c. 110A1 makes it unlawful “for any person who receives, directly or indirectly, any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise (1) to employ any device, scheme, or artifice to defraud the other person, or (2) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.” (Emphasis added.) Again, for the reasons noted above, these prohibitions cannot relate to a “purchase or sale” that constitutes a merger. They can, however, relate to “advising ... as to the value of securities.”
Here UBS and Goldman, Sachs fall within the definition of “any person” who “receives consideration” for “advising... as to the value of securities,” i.e., the fairness opinions regarding the Gillette stock as related to the Procter & Gamble stock. The Secretary does, therefore, have the authority to investigate whether UBS or Goldman, Sachs defrauded the other person. Of course, the other person here is Gillette.
Memorandum at p. 14.
The Court observed:
UBS and Goldman, Sachs also appear to have obligations to Gillette stockholders under the theories espoused by the Supreme Judicial Court in Nycal Corp. v. KPMG Peat Marwick, LLP, 426 Mass. 491, 495-99 (1998). Consequently, to this extent, it would appear that the Secretary has authority to investigate whether UBS or Goldman, Sachs employed any device, scheme, or artifice to defraud Gillette or its stockholders, or engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon Gillette or its stockholders, in connection with the fairness opinions rendered in support of the proposed merger.
Memorandum at pp. 14-15.
The kind of obligations that UBS and Goldman, Sachs may have to the Gillette shareholders under the Nycal decision is set out in Sec. 552 of the Restatement (Second) of Torts. That section describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
The Massachusetts Appeals Court has recently restated the elements of negligent misrepresentation as follows:
“In order to recover for negligent misrepresentation[,] a plaintiff must prove that the defendant (1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information.” Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct 15, 19-20 (1998); Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999).
Savers Property & Casualty Insurance Company v. Admiral Insurance Agency, Inc., 61 Mass.App.Ct. 158, 169 (2004).
Negligent misrepresentation is, in almost all respects, the same as fraud except (1) that a party claiming negligent misrepresentation need show only that the defendant negligently, rather than intentionally, misstated a material fact, and (2) the parties were in privity of contract or the defendant had actual knowledge of the plaintiffs reliance. See, e.g., Nota Constr. Corp., supra, 45 Mass.App.Ct at 21.
In order to establish a claim of fraud, a plaintiff must show “that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.”
Stolzoff v. Waste Systems International, Inc., 58 Mass.App.Ct. 747, 759 (2003).
All of the foregoing must be within the consideration of this Court when assaying the Secretary's new demands upon Gillette. What the Secretary said earlier needs emphasis by its repetition yet again here.
*382 What this case is not about is “the form of a complex merger transaction and the application of the provisions of both state and federal securities law to the transaction” as alleged by Gillette. Subject to other regulatory approval, Gillette is free to merge or not with whom it chooses and the Secretary never contended otherwise. The form of the merger is completely irrelevant and unrelated to the Secretary’s inquiry.
What the Secretary’s investigation should be about is whether, in rendering their fairness opinions, UBS or Goldman, Sachs made false representations of material facts, with knowledge of their falsity, for the purpose of inducing Gillette, and possibly Gillette’s shareholders, to act thereon, and that Gillette, and possibly Gillette’s shareholders, relied upon any such representations as true and acted upon them to their damage.
If there was fraud or negligent misrepresentation by either UBS or Goldman, Sachs, the primary victim is Gillette and, secondarily, its shareholders. Gillette was the recipient of the fairness opinions and, presumably, relied upon them. It is less apparent that Gillette’s shareholders either received or relied detrimentally upon those fairness reports.
The Secretary, apparently, served a Second Subpoena on Gillette within hours of the release by this Court of its April 28,2005 Memorandum. Presumably, the Secretary digested the Memorandum and made a good faith effort to comply with it in the Second Subpoena. Presumably also, Gillette, in malting its very rapid response to this Second Subpoena, was equally cognizant of this Court’s Memorandum, and it too made a good faith effort to comply with it in its response to the Second Subpoena. The Court will, as it must, proceed on those assumptions of good faith efforts in the absence of any reliable evidence to the contrary.
The Court will, as it should, look to see that the Secretary’s investigation is being conducted pursuant to a proper purpose, that the information the Secretary seeks from Gillette is or may be relevant to that purpose, that the information is not already in the Secretary’s possession, and that all legally required administrative steps have been followed. United States v. Gertner, 65 F.3d. 963, 966 (1st Cir. 1995). Additionally, it seems clear that the Secretary must have a belief that UBS or Goldman, Sachs has committed fraud in issuing the fairness opinions. The Secretary “must not act arbitrarily or in excess of his statutory authority, but he need not be confident of the probable result of his investigation.” Attorney General v. Bodimetric Profiles, 404 Mass. 152, 157 (1989). In short, at this beginning stage of his investigation, the Secretary need not state a claim of fraud with the particularity required of pleadings under Mass.RCiv.P. Rule 9(b).
In his first proposed Order relating to the Second Subpoena, received by the Court on May 6, 2005, the Secretary includes four categories of documentary and electronic materials that he seeks to have the Court compel Gillette to produce. Those categories, stated more briefly here, are: (1) studies or reports from McKinsey & Company;[2] (2) e-mails between and among Goldman, Sachs employees and seven specified Gillette executive personnel; (3) e-mails between and among UBS employees and the same seven specified Gillette executive personnel; and (4) e-mails between and among the same seven specified Gillette executives.[3]
As to this proposed Order, the Court will enforce it, if it has not been complied with already, only for any of the foregoing materials that exist in Gillette’s possession, custody or control and that were previously provided to UBS or Goldman, Sachs for use or consideration in connection with their fairness opinions.
In the second proposed Order, received by the Court on May 17, 2005, the Secretary seeks to have Gillette, at its own expense, permit a company named Vance, Inc. to have access to and the opportunity to “search all e-mail, servers, archives, discs, back-up tapes, hard drives (of all computers of Gillette and Gillette personnel), and all back-up systems thereof, and all other data bases of Gillette, necessary to investigate and accomplish retrieval, preservation and copying of the documents [described thereafter].”
Given the size of Gillette and its huge number of employees, any request to examine the kinds of electronic and computerized devices listed in the Secretary’s proposed second Order is nearly impossible to comply with. An affidavit from Kathy Lane, Senior Vice President and Chief information Officer of Gillette, reports the following; (1) there are 18,500 active users on Gillette’s worldwide Domino Notes e-mail system; and (2) the total volume of e-mail traffic on the system is approximately 14 million messages per month, of which approximately 7 million are internal. Further, Ms. Lane avers that “in view of this tremendous volume of e-mail and in an effort to conserve system resources and assure functionality, Gillette encourages users not to retain unneeded email.” Ms. Lane attached Gillette’s September 2003 “EMAIL GUIDELINES” to her affidavit.
The sheer magnitude of any effort to recover the materials sought is daunting.[4] Further, given the nature of the situation, some — perhaps many — of the electronic materials may include information that is subject to the attomey/client privilege[5] or may contain confidential or trade secret information, all of which would first have to be retrieved and then examined before being turned over to anyone.
In this context, the Court again observes that it is UBS and Goldman, Sachs which are being investigated for fraud committed on Gillette, and possibly Gillette’s shareholders, not the other way around.
*383 This Court is not convinced that its power and authority to compel compliance with the Second Subpoena warrants, in any way, the issuance of the second Order sought by the Secretary.

ORDER

For the foregoing reasons, the Secretary’s Emergency Motion for Further Order Regarding Retrieval and Preservation of Documents, Paper #8, is DENIED.
Gillette is ORDERED, if it has not been done so already, to forthwith provide to the Secretary any of the materials listed as items 1-4 on page 2 of the proposed Order attached to the Secretary’s “Recommendations and Contentions Remaining for Consideration,” dated May 6, 2005, Paper #6A, that exist in Gillette’s possession, custody or control and that were previously provided to UBS or Goldman, Sachs for use or consideration in connection with their fairness opinions.

Full familiarity with the April 28, 2005 Memorandum is presumed.

Gillette has already advised the Secretary, and this Court, that it does not have any report from McKinsey & Company, as that entity was engaged by Procter & Gamble, not Gillette.

With regard to e-mails, Gillette has noted that many may have been deleted and are not now available. The deletion, however, is said to have been pursuant to regular company practice and not acts of spoliation. See information infra from the Kathy Lane affidavit.

The complexities and expense of electronic discovery are not unique to this case. See, e.g., Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309 (S.D.N.Y. 2003). See also The Sedona Principles: Best Practices, Recommendations and Principles for Addressing Electronic Document Production (March 2003).

One of the seven specified persons in the e-mail exchanges is Gillette’s General Counsel.