NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-435

GIUL, LLC

vs.

SHENGHUO MEDICAL, LLC, & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

GIUL, LLC (GIUL), invested $64,000 in Shenghuo Medical, LLC (Shenghuo),[2] with the understanding that Shenghuo would use the funds to secure its own investment in Guided Therapeutics, Inc. (GTI), the manufacturer and worldwide distributor of a medical device known as LuViva (LuViva device).[3]  When the investment did

---

[1] Michael J. Antonoplos, Richard P. Blumberg, Mark L. Faupel, and Mark S. Pearlstein.  Guided Therapeutics, Inc., was joined solely on reach and apply claims.

[2] Shenghuo later changed its name to K2 Medical.  The judge and the parties referred to the company as Shenghuo and so do we.

[3] The LuViva device is a cervical cancer screening and diagnostic device which "uses spectroscopy to project light onto a woman's cervix, causing cells associated with cancer to fluoresce or to give other recognizable signals."

not produce the return that GIUL and its owner, Paul Conte, anticipated, GIUL sued Shenghuo and its managing members, Michael J. Antonoplos, Richard P. Blumberg, and Mark L. Faupel. GIUL also sued Shenghuo's legal counsel, Mark S. Pearlstein. The majority of GIUL's claims, which were advanced in initial and amended complaints, were dismissed or resolved in favor of the defendants prior to the commencement of a bench trial on claims arising from the Massachusetts Uniform Securities Act, G. L. c. 110A, § 410 (a) (MUSA), and the Massachusetts Consumer Protection Act, G. L. c. 93A, § 11 (c. 93A).[4]  The judge ruled in favor of the defendants on all remaining claims after the bench trial.

On appeal, GIUL argues, among other things, that the judge applied an incorrect legal standard when he concluded that GIUL failed to prove that the defendants did not disclose material information about GTI's financial condition before GIUL made its investment.  We agree.  We vacate the portion of the judgment on the MUSA and c. 93A claims as to Shenghuo, Antonoplos, and

---

[4] The procedural history of the litigation is set forth in the judge's findings and need not be repeated here.  It suffices to note that GIUL's claims of fraud, breach of fiduciary duty, breach of contract, reach-and-apply claims, and conspiracy were disposed of on motions for judgment on the pleadings and summary judgment.  GIUL makes no argument about these claims on appeal.

2

Blumberg, and remand for further proceedings consistent with this memorandum and order.  We otherwise affirm the judgment.

Background.  We summarize the facts found by the judge as articulated in his detailed findings.  Faupel coinvented the LuViva device, which, as noted, is manufactured by GTI.  Faupel served as chief executive officer of GTI from approximately 2008 through 2013, and again in 2023.[5]  Blumberg met Faupel around 2006 or 2007 and subsequently became a shareholder in GTI, through which he gained familiarity with the LuViva device, its intended use, and its international commercial prospects.  Blumberg reached out to entities that had experience in products being marketed and used internationally.  Ultimately, he approached Antonoplos, who had served as chief executive officer of a breast cancer diagnostics company.

Antonoplos was interested in the venture and, in February 2015, Antonoplos and Blumberg formed Shenghuo for the purpose of obtaining licensing rights from GTI, raising capital from investors, and distributing the LuViva device throughout Asia.  In the beginning, Antonoplos and Blumberg were the sole managing members of Shenghuo and exercised full control over its

---

[5] From 2013 to 2015, Faupel worked as a consultant for GTI and then joined its board of directors in 2016.

3

operations. Soon thereafter, Faupel and Pearlstein became members of Shenghuo as well.

In June 2016, Shenghuo entered into a licensing agreement with GTI in which GTI gave Shenghuo a $200,000 conditional loan. Under the agreement, GTI was obligated to repay the loan only if it obtained at least $1 million in additional financing within a specified timeframe. If GTI failed to obtain such financing, it would not incur a repayment obligation, but the agreement allowed for the possibility that any investment from Shenghuo could be converted into GTI common stock.

Within weeks of signing the licensing agreement with GTI, Shenghuo raised approximately $136,000 and sought additional capital to meet the $200,000 investment requirement. Other investors included John Imhoff and Stephen Maloof.[6] Both of them had ownership interests in GTI and made investments under subscription agreements drafted by Pearlstein.[7] Blumberg communicated with these investors directly and explained that repayment depended on GTI's success in raising funds.

---

[6] Maloof had his spouse make the investment on his behalf.

[7] These agreements provided that repayment would occur only if GTI obtained financing and that investors would retain their equity interest even if repayment occurred.

4

At about the same time, Antonoplos reached out to Conte, who owns and controls GIUL.[8]  Antonoplos called Conte in June 2016 to solicit investments.  The judge found that during this conversation Antonoplos made clear to Conte that Shenghuo had no present income and that its only "real asset was its licens[ing] agreement with GTI."  Antonoplos informed Conte that he had already helped raise approximately $136,000 and said that Shenghuo needed an additional $64,000 to complete its funding obligations.  Antonoplos further explained in "general terms that anyone willing to invest the remaining $64,000 would receive an ownership interest in Shenghuo as well as a conditional right to repayment of the investment amount."  The judge found that Antonoplos told Conte that repayment of the investment "was contingent on GTI raising an additional $1 million and then repaying Shenghuo," and that Antonoplos "never told Conte that repayment would be guaranteed or that there would be any deadline by which Shenghuo would be required to repay this investment."  During this same conversation, Conte asked Antonoplos to send him an e-mail message summarizing the investment opportunity.

---

[8] Conte and Antonoplos had known each other for about ten years and spoke with each other by phone several times a week. Conte had decades of professional experience with financial transactions and investments as well as a law degree.

5

As requested, on June 9, 2016, Antonoplos followed up in an e-mail message to Conte. The e-mail message stated, "[H]ere is a deal that perhaps you can assist on, but it has a short fuse . . . check the website for [GTI]. . . . [I]f you look at the [GTI] web site you will readily [] see the 'integrity' of this device." Antonoplos then outlined the terms of the investment as follows:

> "As part of the aforementioned agreement Shenghuo need to come up with a total of $200K payment (loan) to [GTI] by July 31, 2016 . . . in this regard we have raised $136K so we need an additional $64K by the end of July . . .

> "For the $64K the following will be offered:

> "20% interest if loan is paid back within 90 days, another 25% if not paid thereafter and any unpaid balance not paid by December 31, 2016 will accrue and 20% annual compound interest factor[.]

> "Additionally, the lender will be given 100% warrant coverage on their loan and in addition they will have the ability to convert their loan into stock plus receive an interest in Shenghuo."

Antonoplos then wrote, "Obvious[ly] . . . if there is interest there is more documented info you would need but let me say this[,] I am invested in this[,] it is a winner and the lender is so covered[.] [L]et's discuss further." In the subject line of the e-mail message, Antonoplos provided a link to GTI's website.

At the time, GTI was a publicly traded company and had a public website which provided information to potential

6

investors, including links to its prior regulatory filings with the Securities and Exchange Commission (SEC).  Those filings disclosed that GTI was not profitable, had limited cash reserves, carried significant debt, and required additional financing to continue operations.[9]  More specifically, the filings stated that GTI had a "working capital deficit of approximately $4.0 million," was uncertain "that [its] existing and available capital resources [would] be available to satisfy [its] funding requirements through the second quarter of 2016," and had "substantial doubt about [its] ability to continue" generating profit and functioning as a business.  The judge found that if Conte "had clicked on the link to GTI's website that Antonoplos provided, he could easily have accessed GTI's regulatory filings with the SEC, including the most recent 10-K annual report and most recent 10-Q quarterly report."  These reports disclosed the information described above.

Two days later, on June 11, 2016, Conte responded to Antonoplos's e-mail message and asked whether "the lender get[s] the 64K in stock too in making the loan?" and if so Conte would be interested in making an investment himself.  Antonoplos replied "Yes" and later that day sent a clarifying e-mail

---

[9] While those filings were not introduced by the parties at trial, the judge took judicial notice of them.

7

message and explained, "[J]ust to clarify, [the] $64K lender gets, at his/her option:  (1) . . . $76,800 if repaid within 90 days or 4,413,286 shares or . . . $83,200 if repaid later or 4,781,060 shares."  Conte then agreed to the deal and Antonoplos and Blumberg instructed Pearlstein to prepare an agreement for Conte.  Pearlstein did so by relying on the drafts of the agreements he had prepared for Imhoff and Maloof.  As the judge explained, Pearlstein changed the name of the investor to Conte and changed the amount of the investment from $60,000 to $64,000 but failed to insert the conditional repayment provision that Antonoplos had offered Conte in the June 11 e-mail message.  No one noticed this error and, after reviewing it, Conte signed the agreement on July 18, 2016, and wired Shenghuo $64,000 the next day.[10]  Later, Conte asked to revise the agreement to state that the investment was being made by GIUL rather than Conte individually.  Pearlstein made that change in the version he had previously sent to Conte and that Conte had already signed.

After receiving the final investment from Conte in July of 2016, Shenghuo made its investment payment of $200,000 to GTI. However, GTI's subsequent efforts to raise additional capital

---

[10] The agreement signed by Conte included representations that he had sufficient knowledge and experience to evaluate the investment, had access to relevant financial information, and understood the risks.

from that point on and through early 2017 were unsuccessful. Conte made inquiries about the status of GIUL's investment, and in 2018 sent e-mail messages to Faupel, Antonoplos, and Pearlstein seeking assurances that GIUL would be repaid with interest. Antonoplos and Faupel passed Conte's e-mail messages onto GTI's then chief executive officer, Gene Cartwright, who assured Conte that he would be repaid when GTI raised $1 million in financing, something GTI was "in the end stages of completing."

However, by the end of 2019, GTI suffered a severe cash flow crisis and failed to raise the additional $1 million. GTI reached out to Shenghuo and explained that its existing $200,000 debt to Shenghuo was an obstacle to raising additional capital. Blumberg and Pearlstein, the managing members at the time, then concluded it was in the best interest of Shenghuo to enter into an exchange agreement with GTI, under which Shenghuo's loan to GTI would be converted into GTI stock. The exchange agreement thereby (1) ensured that GTI would not need to raise the additional capital to reach the $1 million repayment threshold, and (2) effectively extinguished the condition under which Shenghuo would have to repay GIUL. Although, as the judge found, GTI has become very valuable since that agreement was

9

made, GIUL has still not received repayment on its initial $64,000 investment.[11]

GIUL commenced this action in 2019. As previously stated, a bench trial on GIUL's MUSA and c. 93A claims was held in March 2024. The thrust of GIUL's allegations at trial was that the defendants withheld material information from Conte before GIUL invested in Shenghuo. As relevant here, the judge found that GIUL had not proved that (1) the defendants never intended to provide GIUL with a conditional repayment right; (2) no one told Conte that Shenghuo's managing members would make any future decisions to exchange its loan to GTI for shares of stock in GTI; (3) no one disclosed GTI's dire financial condition to Conte; and (4) Conte was not told that repayment of GIUL's investment depended on GTI's raising $1 million.[12]

---

[11] As Shenghuo's only asset is its equity interest in GTI and GTI has done very well, Shenghuo's other investors, Maloof and Imhoff, have seen sizable returns on their investment as they both hold ownership interests in GTI. GIUL's return, in comparison, has been far more modest as it does not hold any independent ownership interest in GTI.

[12] GIUL also claimed that it was misled by Shenghuo's failure to explain that it had no "sales, approvals, products, partners, or manufacturer or manufacturing expertise" and that its only real asset was its licensing agreement with GTI, and by not disclosing that GTI's investment banker was not investing in GTI but seeking outside investors. The judge rejected these allegations as well and GIUL does not challenge these rulings on appeal.

10

Regarding Shenghuo's granting a conditional repayment right to GIUL, the judge "found that the conditional repayment terms always were and remain part of GIUL's subscription agreement with Shenghuo," even though Pearlstein "inadvertently omitted them from the final forms of the agreement [that] Pearlstein sent to Conte for his signature." The judge also found that Shenghuo was not required to disclose to GIUL that Shenghuo or its managing members could convert Shenghuo's loans to stock in GTI given "any reasonable investor in Conte's position would have known, that Conte and GIUL would have no control over any of Shenghuo's business decisions." As for GIUL's contention that GTI's dire financial condition was never disclosed, the judge found that Antonoplos told Conte to go to GTI's website which contained its public filings and therefore GIUL did not show "any material information about GTI was withheld from" it. Lastly, the judge credited Antonoplos's testimony that he told Conte that repayment of GIUL's $64,000 was conditioned on GTI raising $1 million and relied on Conte's 2018 e-mail messages which admitted the same.

Regarding Conte's MUSA claim against Pearlstein, the judge held Pearlstein did not "make" nor have "involvement in mak[ing] an offer to sell a security to GIUL or soliciting an offer by GIUL to invest in Shenghuo," and that even if Pearlstein was

11

"acting as Shenghuo's legal counsel in connection with GIUL's investment . . . that limited role as an agent" could not subject him to primary or secondary liability under MUSA. Similarly, with regard to Faupel, the judge found that Faupel had no liability because he had no communication with GIUL about its investment in Shenghuo and did not act as Shenghuo's agent to facilitate the sale.

Discussion. 1. GIUL's MUSA and c. 93A claims against Pearlstein and Faupel. GIUL has not raised any challenge regarding the dismissal of the claims against Pearlstein. Accordingly, any arguments regarding Pearlstein's liability are waived under Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019). Even if this were not the case, we agree with the judge that there was no evidence that Pearlstein, who only drafted agreements as Shenghuo's counsel, "offer[ed]," "s[old]," or "materially aid[ed]" the sale of a security. G. L. c. 110A, § 410 (a) (2), (b) (defining primary and secondary liability respectively under MUSA). The same reasoning supports dismissal of GIUL's c. 93A claim against Pearlstein. Even if GIUL had raised an argument regarding the judge's decision, we would nevertheless agree with the judge that Pearlstein's decision as a managing member in 2019 to exchange Shenghuo's loan interest in GTI for common stock was a "reasonable exercise

12

of business judgment." We therefore affirm the judgment in favor of Pearlstein in its entirety.

With respect to Faupel, GIUL argues that the judge "entirely missed [its] point." We are not persuaded. To the contrary, the judge properly concluded that a MUSA claim cannot be brought against Faupel as he had no communications with Conte or GIUL regarding Shenghuo's offer and, "although [he] was acting as Shenghuo's agent during 2016 in trying to identify a commercial partner in China," Faupel also did nothing to materially aid the transaction at issue here. As Faupel cannot be held primarily or secondarily liable under MUSA, all claims, including the c. 93A claim, against him were properly dismissed.

2. GIUL's MUSA claim against Shenghuo, Antonoplos, and Blumberg (remaining defendants). We reach a different conclusion regarding the judgment as it concerns Shenghuo, Antonoplos, and Blumberg.

When reviewing the decision of a judge after a bench trial, we review his "findings of fact . . . for clear error" and "legal conclusions, by contrast, we review de novo." H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13 (2022). To prove a claim under MUSA, the plaintiff must show

> "(1) the defendant 'offer[ed] or [sold] a security'; (2) in
> Massachusetts; (3) by making 'any untrue statement of a
> material fact' or by omitting to state a material fact;
> (4) the plaintiff did not know of the untruth or omission;

13

and (5) the defendant knew, or 'in the exercise of reasonable care [would] have known' of the untruth or omission" (footnote omitted).

Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 52 (2004), quoting G. L. c. 110A, § 410 (a) (2).

To begin with, we agree with GIUL that while the judge cited to the applicable law, he applied it incorrectly when he concluded that GTI's financial condition had been disclosed to Conte before GIUL made its investment.[13] According to the judge, Antonoplos's e-mail message which included a link to GTI's website was a proper disclosure because "[i]f Conte had gone to

_____

[13] We agree with the judge's reasoning that GIUL failed to prove that its other allegations rise to the level of material omissions under MUSA and that they are not unfair or deceptive under c. 93A. Regarding GIUL's claims that the defendants never intended to provide GIUL with a conditional repayment right and that GIUL was not told repayment would only occur if GTI reached the $1 million fundraising threshold, the judge relied on Antonoplos's testimony, which he found credible, and, in addition, did not credit Conte's contradictory testimony. The credibility of the witnesses is the province of a judge in a bench trial and as "the judge's account is plausible in light of the entire record" we "decline to reverse it." Demoulas v. Demoulas Super Mkts, Inc., 424 Mass. 501, 510 (1997). As for GIUL's claim that it was not informed Shenghuo's managing members would make all future decisions to exchange its loan to GTI for shares of stock in GTI, we agree with the judge: "To the extent that GIUL now contends that it had such a right, . . . GIUL was never promised" that right by any of the defendants based on our review of Antonoplos's June 9 e-mail message and the agreement between GIUL and Shenghuo. And even if it was, a reasonable investor, and especially someone like Conte who had a law degree, would have known that GIUL would have no right to dictate Shenghuo's subsequent business decisions. See Marram, 442 Mass. at 58 (test for materiality uses a "reasonable investor" standard [citation omitted]).

14

[GTI's website] he could have easily accessed and been able to review GTI's filings . . . in which GTI fully disclosed its financial and business prospects."  However, as GIUL correctly contends, buyers have no duty to investigate or verify facts alleged by a seller of securities.  See Marram, 442 Mass. at 53, quoting MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc., 886 F.2d 1249, 1256 (10th Cir. 1989) ("the buyer [of a security does not] have any duty to investigate or to 'verify a statement's accuracy'").  Consequently, when Antonoplos provided Conte with a link to GTI's website and told him to "check [it]," Conte was not required to then explore GTI's website and seek out its public filings.  A seller under MUSA "who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects" (emphasis added).  Kushner v. Beverly Enters., 317 F.3d 820, 831 (8th Cir. 2003), quoting Helwig v. Vencor, Inc., 251 F.3d 540, 561 (6th Cir. 2001) (addressing seller's disclosure obligations when selling securities under Securities Exchange Act, 15 U.S.C. § 78j[b], 78t).  See Marram, supra at 51 ("we look to Federal decisions" on Securities Exchange Act for our interpretation of MUSA).  Simply providing the link to GTI's website, which required additional navigation via the Internet to locate GTI's public

15

filings, is not the same as providing a link to the filings themselves. Moreover, the argument that Conte knew or should have known the link to GTI's website would disclose GTI's financial problems is not supported by the text of the e-mail message itself. In the second paragraph of the e-mail message, Antonoplos told Conte "if you look at the [GTI] web site you will readily . . . see the 'integrity' of this device which is presently being manufactured and distributed worldwide." Objectively viewed, the e-mail message does not disclose that clicking onto GTI's website would reveal GTI's financial difficulties. Rather, it indicated no more that the website would confirm the "integrity" of the LuViva device. Our conclusion that the judge erred is also consistent with MUSA's central premise: to create a "strong incentive for sellers of securities to disclose fully all material facts about the security." Marram, supra at 51. Furthermore, because the remaining defendants are potentially liable under MUSA for this omission, they are also potentially liable under c. 93A should the judge find, on remand, that the omission was material and amounted to an unfair or deceptive practice.

That said, the omission of a fact is only one of the elements of a MUSA violation. See Marram, 442 Mass. at 52. The plaintiff also needed to prove that the fact omitted was

16

material.  See id.  Here, there was evidence that the entire basis of this transaction was GTI's need for additional capital in order to proceed with marketing its product.  In that context, the judge could find that the fact that GTI was not viable without additional capital was not a material fact in the context of this investment.  Whether the facts and inferences drawn from the facts lead to a conclusion of materiality is for the trial judge to decide in the first instance.

Conclusion.  We vacate so much of the judgment as entered in favor of Shenghuo, Antonoplos, and Blumberg on GIUL's claims under the Massachusetts Uniform Securities Act and G. L. c. 93A, and remand for further proceedings consistent with this

17

memorandum and order. The remainder of the judgment is affirmed.[14]

So ordered.

By the Court (Vuono,
  Ditkoff & D'Angelo, JJ.[15]),

*Paul Little*

Clerk

Entered:  June 22, 2026.

---

[14] GIUL's request for attorney's fees is denied.  If, after remand, judgment is granted in favor of the GIUL on its c. 93A claim, GIUL shall be awarded reasonable attorney's fees under that statute.  See G. L. c. 93A, § 11.  Attorney's fees attributable to this appeal and any proceedings after remand may be included in the award.  See Patry v. Liberty Mobilehome Sales, Inc., 394 Mass. 270, 272 (1985).

[15] The panelists are listed in order of seniority.